Alejandro **HERNANDEZ**,
Plaintiff/Counter–
Defendant,

v.

The **CITY OF EL PASO; Jesus Terrones, in his individual and official capacity; Guillermo Martinez, in his individual and official capacity; Arturo Ruiz, Jr., in his individual and official capacity; Sal Dominguez, in his individual and official capacity; Antonio Tabullo, in his individual and official capacity; Joe Zimmerly, in his individual and official capacity; and Pedro Ocegueda, in his individual and official capacity, Defendants/Counter–Plaintiffs.**

No. EP–08–CV–222–PRM.

United States District Court,
W.D. Texas,
El Paso Division.

July 9, 2009.

Arthur Loevy, Jon Loevy, Loevy & Loevy, Chicago, IL, James Allen Martinez, Law Office of James Martinez, El Paso, TX, Kevin T. Glasheen, Kristopher Edwin Moore, Glasheen Valles & Dehoys, LLP,

Lubbock, TX, for Plaintiffs/Counter–Defendants.

Duane A. Baker, Attorney at Law, Jennifer F. Callan, El Paso City Attorney's Office, El Paso, TX, for Defendants/Counter–Plaintiffs.

*MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING AS MOOT PLAINTIFF'S MOTION TO STRIKE CERTAIN OPINIONS OF THE AFFIDAVIT OF DEFENDANTS' EXPERT WITNESS ROBERT TAYLOR; AND DENYING AS MOOT DEFENDANTS' MOTION TO STRIKE AFFIDAVIT AND TO EXCLUDE PLAINTIFF'S EXPERT WITNESS TROY WILKE*

PHILIP R. MARTINEZ, District Judge.

On this day, the Court considered Defendants Jesus Terrones, Guillermo Martinez, Arturo Ruiz, Jr., Sal Dominguez, Antonio Tabullo, Joe Zimmerly, and Pedro Ocegueda's (collectively, "Defendants") "Motion for Summary Judgment," filed on September 4, 2008; Defendants' "Appendix of Material in Support of Defendants' Motion for Summary Judgment," filed on September 4, 2008; Plaintiff Alejandro Hernandez's ("Plaintiff") "Response in Opposition to Defendants' Motion for Summary Judgment," filed on November 25, 2008;[1] Plaintiff's "Brief in Support of Plaintiff's Response in Opposition to Defendants Jesus Terrones, Guillermo Martinez, Arturo Ruiz, Jr., Antonio Tabullo,

Joe Zimmerly, and Pedro Ocegueda's Motion for Summary Judgment," filed on November 25, 2008; Plaintiff's "Appendix to Plaintiff's Response to Defendants' Motion for Summary Judgment," filed on November 25, 2008; Defendants' "Reply to Plaintiff's [sic] Response in Opposition to Defendants [sic] Motion for Summary Judgment," filed on December 8, 2008; Plaintiff's "Motion to Strike Certain Opinions of the Affidavit of Defendant's Expert Witness Robert Taylor," filed on December 19, 2008; Defendants' "Response to Plaintiffs [sic] Motion to Strike Certain Opinions of Defendants [sic] Expert Witness Robert Taylor," filed on December 29, 2008; Defendants' "Motion to Strike Affidavit and to Exclude Plaintiffs [sic] Expert Witness Troy Wilke," filed on December 5, 2008; Plaintiff's "Response in Opposition to Defendant Officers' Motion to Strike Affidavit and Exclude Plaintiff's Witness Troy Wilkie [sic]," filed on December 19, 2008; Defendants' "Reply to Plaintiffs [sic] Response in Opposition to Defendants [sic] Motion to Strike Affidavit and Exclude Plaintiffs [sic] Expert Witness Troy Wilke," filed on December 29, 2008, in the above-captioned cause. After due consideration, the Court is of the opinion that Defendants' motion for summary judgment should be granted in part and denied in part.

## I. INTRODUCTION

On October 19, 1994, Alejandro Hernandez ("Plaintiff") was wrongfully convicted in the 168th District Court of El Paso, Texas for murdering Robert Cobb ("Cobb") and sentenced to ninety-nine years in prison.[2] Pl.'s Second Am. Compl.

---

1. On October 4, 2008, the Court granted Plaintiff leave to file his response to Defendants' motion for summary judgment on November 25, 2008, so he could conduct further discovery in this matter. Docket No. 41.

2. The Texas Eighth District Court of Appeals affirmed Plaintiff's conviction. *Hernandez v. State*, No. 08–94–355–CR, slip op. (Tex.App.-El Paso, Aug. 15, 1996, no pet.).

¶¶ 17, 58–60; App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 47. On June 21, 2006, after serving nearly thirteen years in prison, Pl.'s Second Am. Compl. ¶¶ 2, 16, the Texas Court of Criminal Appeals overturned Plaintiff's conviction and remanded the cause to the 168th District Court, *Ex Parte Hernandez*, No. AP–75,445, 2006 WL 1687713 (Tex.Crim.App. June 21, 2006) (per curiam). On September 18, 2006, the 168th District Court, with the cooperation of the El Paso District Attorney's Office, dismissed the charges against Plaintiff. Pl.'s Second Am. Compl. ¶ 59; App. in Support of Defs.' Mot. for Summ. J. Q–S. Following the dismissal of his charges, on June 20, 2008, Plaintiff filed suit against the City of El Paso and several police officers under 42 U.S.C. §§ 1983 and 1985(3), as well as under the Fourteenth Amendment to the U.S. Constitution, for violations of his civil rights resulting from his wrongful arrest, prosecution,[3] and conviction. Pl.'s Second Am. Compl. ¶¶ 63–78. Aside from these federal claims,[4] Defs.' Mot. for Summ. J. ¶ 2, Plaintiff additionally brings state law claims for intentional infliction of emotional distress, malicious prosecution, and civil conspiracy.[5] Pl.'s Second Am. Compl. ¶¶ 79–85.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On May 11, 1994, the El Paso Police Department discovered the lifeless body of Robert Cobb, a homeless Vietnam veteran, lying beside his broken-down car near the north desert area of El Paso, Texas. Pl.'s Second Am. Compl. ¶¶ 19–21. At approximately 2:30 a.m. on the night of Cobb's death, Dee "Baby" Stewart ("Stewart") was in his apartment—located near the scene of Cobb's murder—when he received an unexpected visit from his neighbor, Brandon Hamilton ("Hamilton"). *Id.* ¶ 24; App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 4, 14. During Hamilton's visit, Stewart noticed that "Hamilton was breathing hard, his shoes were covered in mud, and he carried a small pocket knife." Pl.'s Resp. to Defs.' Mot. for Summ. J. 1; *accord* Pl.'s Second Am. Comp. ¶ 24. Aside from these observations, Stewart additionally noticed that Hamilton's hands and pocket knife were covered in blood. Pl.'s Resp. to Defs.' Mot. for Summ. J. 1; App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 4, 14. Upon his arrival, Hamilton allegedly told Stewart that he "wasn't going to believe it, but [he] just killed somebody!" Pl.'s Second Am. Compl. ¶ 24; App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 4, 14. Hamilton then proceeded to narrate the intricate details of Cobb's murder as he washed the blood off his hands and knife in Stewart's kitchen sink. Pl.'s Second Am. Compl. ¶¶ 25, 27; Pl.'s Resp. to Defs.' Mot. for Summ. J. 2.

Allegedly, Hamilton told Stewart that, on the evening of May 10, 1994, he approached an old Pontiac Trans Am where Cobb was sleeping. Pl.'s Second Am. Compl. ¶ 25; App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 14. While Cobb slept inside the vehicle, Hamilton attempted to discretely enter the vehicle through the

---

**3.** On October 27, 2008, the Court dismissed Plaintiff's malicious prosecution claim and also dismissed Defendant Sal Dominguez in his individual and representative capacity from this action without prejudice. Docket No. 56–57.

**4.** Not addressed here, however, is Plaintiff's *Monell* claim against the City of El Paso for the purported "unlawful municipal policies and practices" employed by Defendants in their capacity as police officers in this action. Pl.'s Second Am. Compl. ¶¶ 2, 69–72.

**5.** Defendants filed a counter-claim against Plaintiff claiming that, if they prevail, they are entitled to attorneys' fees pursuant to 42 U.S.C. § 1988. Defs.' Orig. Ans. ¶ 31.

passenger's side, eventually awakening Cobb. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 14. After Cobb awoke, both men spoke briefly, and Hamilton entered the vehicle through the passenger's side. Pl.'s Second Am. Compl. ¶¶ 25–26. Following a short conversation, Hamilton asked Cobb to step outside the vehicle so they could "look at the stars." App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 14. While they were standing next to the vehicle, Hamilton stabbed Cobb on the shoulder close to the neck with a two-inch pocket knife. *Id.* Despite Cobb's supplications, Hamilton stabbed him twenty-nine times in his upper chest, neck, and back. *Id.* at 30; Pl.'s Second Am. Compl. ¶ 21. Realizing that Cobb was still breathing, Hamilton obtained a steel anti-theft device from the trunk of Cobb's vehicle. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 34. Thereafter, Hamilton rolled Cobb's body over and crushed his face with the steel device, bludgeoning him to death. Pl.'s Second Am. Compl. ¶¶ 25–26. After killing Cobb, Hamilton stole a few electronic items from Cobb's vehicle and eventually fled the scene. *Id.* ¶ 26. Uncertain that Hamilton was telling the truth, Stewart did not contact the police that night. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 4, 14, 46.

The next morning, on May 11, the El Paso Police Department discovered Cobb's murdered body. Pl.'s Second Am. Compl. ¶¶ 19–21. Shortly after the police arrived at the crime scene, El Paso Police Sergeant Pedro Ocegueda ("Sergeant Ocegueda") named Detective Jesus Terrones ("Detective Terrones") as the case agent in Cobb's homicide.[6] Terrones Dep. 131:9–

15; Pl.'s Second Am. Compl. ¶ 28. Thereafter, in an attempt to gather evidence, Detective Terrones and Detective Sal Dominguez ("Detective Dominguez") visited Garcia's Automotive, a business located near the crime scene. Terrones Dep. 125:12–15. After briefly speaking to Garcia, the two detectives went to Ed's Classic Upholstery Shop located in the same shopping center. Pl.'s Second Am. Compl. ¶ 31. There, Detective Terrones interviewed Stacy Leon, the owner's wife. Terrones Dep. 126:9–15. During the interview, Leon mentioned that Augustin Fabio Carreon ("Carreon"), Garcia's stepson from the neighboring business, was involved in gangs and was responsible for the graffiti on the back walls of the shopping center. Terrones Dep. 125:12–20; App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 18. Based on this information, Detective Terrones examined the graffiti on the back walls. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 18.

Following his inspection of the graffiti, Detective Terrones was able to discern the alias "Gopy," which he believed to be gang-related. Pl.'s Second Am. Compl. ¶¶ 30–32. Detective Terrones thereafter "contacted the El Paso gang unit to see if 'Gopy' was a moniker for a known gang member." *Id.* ¶ 30. By the time Detective Terrones left the shopping center, he "received information that 'Gory,' not 'Gopy,' was an alias for Robert Reyes Hernandez" ("Hernandez"). *Id.* ¶ 32. After searching through the El Paso Police Department's records management system, Terrones Dep. 183:16–184:2, Detective Terrones realized that police had previous-

---

**6.** While at the crime scene, the El Paso Police Department lifted fifteen latent fingerprints from Cobb's vehicle and other items, but "only 5 [fingerprints] were determined complete enough to have evidentiary value." Pl.'s Second Am. Compl. ¶ 29. Nevertheless, out of the five viable fingerprints, the police determined that three belonged to Robert Cobb, leaving the remaining two fingerprints unidentified at that early stage in the investigation. *Id.*

ly arrested Hernandez and Plaintiff "for [attempting to] shoplift[ ] a pair of jeans at a Mervyn's Department Store" some time before Cobb's murder, Pl.'s Second Am. Compl. ¶ 32. In light of this information, Detective Terrones began drafting an affidavit seeking the arrest of Plaintiff for Cobb's murder. Pl.'s Second Am. Compl. ¶ 32.

The following day, on May 13, Detectives Terrones and Dominguez returned to Ed's Classic Upholstery Shop. *Id.* ¶ 33. Once they arrived, Rolando Echemendia ("Echemendia"), one of Leon's employees, approached the detectives and told them that he had witnessed Cobb's murder. Terrones Dep. 127:5–128:10. During their conversation, Echemendia stated that Carreon was involved in the murder and that Plaintiff was his accomplice. Pl.'s Second Am. Compl. ¶¶ 34–38. In light of this information, Detective Guillermo Martinez ("Detective Martinez") and Detective Arturo Ruiz, Jr. ("Detective Ruiz") took Echemendia to police headquarters where Detective Martinez interviewed him. Martinez Dep. 115:25–116:4. At police headquarters, Echemendia gave a statement, which provided in relevant part:

> What I saw happened at about 1:30 a.m. early Wednesday morning, 05–11–1994. On that early morning[,] I was outside of the shop at 9411 Dyer ... At about that time[,] I saw the three males standing ... on the corner of Dyer and Diana. They were all standing[ next to a Trans Am type of car ... I noticed that all of the males were having a discussion of some type ... One of the males was a white male that had a beard ... The second male was a person by the name of [Carreon], ... he is the son of the owner of Garcia's Auto Shop, which is located in the same shopping strip where I work at ... The other male was a Latin male, 23 to 24 years of age.
>
> \* \* \*
>
> The three males were arguing about money ... I could also see that the white male was carrying some type of black bag under one of his arm pits ... [T]he contents of the black bag were what I believed to be round balloons containing [h]eroin ... When the white male showed the contents of the black bag to [Carreon] and the Latin male, [Carreon] told the white male to give him the stuff and that he would give the money to the white male later ... The white male then told the other two males to get into the car ... The car then backed up towards Dyer ... just West of the shopping strip center where I work at ... A short time later I heard what appeared to be moans and groans coming from the area where they had driven to ... While I was there waiting[,] I heard [Carreon and the Latin male] running ... I then heard [Carreon] tell the Latin male, "*te lo hechaste, Buey*," which I understood to say, you killed him. The Latin male then told [Carreon], "*dame una camisa*," which I understood to mean, give me a shirt. I also saw that the Latin male had blood on his shirt and on his right hand ... I saw [Carreon] and the Latin male running to the front of Garcia's Auto Shop.[7]

App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 26 (emphasis in original).

After giving his statement to the police, Echemendia identified Carreon from a single photograph provided by Detective Martinez. Martinez Dep. 160:17–161:4; Pl.'s Second Am. Compl. ¶ 40. Additional-

---

7. Aside from the three males, Echemendia stated that he also observed a black female at the time of Cobb's murder, App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 26; however, the police were never able to locate her, Pl.'s Second Am. Compl. ¶ 53.

ly, Echemendia identified Plaintiff as Carreon's accomplice from a photographic line-up prepared by Detective Terrones. Pl.'s Second Am. Compl. ¶ 40; Terrones Dep. 213:8–10; Martinez Dep. 166:14–18. After hearing Echemendia's recitation of events, Detective Terrones prepared affidavits and arrest warrants for Carreon and Plaintiff. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 12, 16. As such, Detective Terrones dispatched Detectives Joe Zimmerly ("Detective Zimmerly") and Antonio Tabullo ("Detective Tabullo") to arrest Carreon and Plaintiff. Pl.'s Second Am. Compl. ¶ 39.

Following a brief search, Detectives Tabullo and Zimmerly located Carreon at a bus stop near Garcia's Automotive and subsequently took him to police headquarters. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 12. At police headquarters, Detective Tabullo interrogated Carreon, who initially maintained his innocence. Pl.'s Second Am. Compl. ¶¶ 41–42. Despite insisting on his innocence, Carreon eventually signed a statement implicating himself and another man in Cobb's death after Detective Tabullo confronted him with Echemendia's accusatory statement. Terrones Dep. 178:16–17; App. in Support of Defs.' Mot. for Summ. J.H. After his alleged confession, Carreon claimed that he simply knew his purported accomplice by the nickname "Guero." Pl.'s Second Am. Compl. ¶ 42. At that time, Detective Ruiz, under the direction of Sergeant Ocegueda, returned to Carreon and showed him a single photograph of Plaintiff. Id. ¶ 44; App. to Pl.'s Resp. to Defs.' Mot. for

Summ. J. 23. After Detective Tabullo allegedly told Carreon that "he could go free" if he named his accomplice, Pl.'s Second Am. Compl. ¶ 41, Carreon signed an additional statement identifying Plaintiff as his accomplice, App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 6, 17. That night, based on Carreon's identification, Detectives Zimmerly and Martinez arrested Plaintiff at his residence.[8] Pl.'s Second Am. Compl. ¶ 43.

However, the next day, Sergeant Ocegueda advised Detectives Dominguez and Martinez that he had received a call from Stewart. Id. ¶ 46. Sergeant Ocegueda told them that Stewart had notified him that Hamilton, his neighbor, might be involved in Cobb's murder. App. in Support of Defs.' Mot. for Summ. J. H. Specifically, Stewart told the officers that, on the night of Cobb's death, Hamilton confessed to him that he had killed Cobb and stolen some electronic items from his vehicle.[9] Pl.'s Resp. to Defs.' Mot. for Summ. J. 2. After taking Stewart's statement, App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 14, Detectives Martinez and Dominguez brought Hamilton to police headquarters, Martinez Dep. 174:5–8.

At police headquarters, the detectives positively matched Hamilton's fingerprints to a previously unidentified latent fingerprint found at the scene of Cobb's murder. Pl.'s Second Am. Compl. ¶ 47. Based on this evidence, Sergeant Ocegueda directed Detective Dominguez to interview Hamilton. Terrones Dep. 196:5–12; see Martinez Dep. 119:14–15. During the

---

8. Despite identifying Plaintiff as his alleged accomplice, once Carreon saw Plaintiff for the first time, he adamantly asserted to Detectives Terrones and Ruiz that he did not know him; see Terrones Dep. 180:25–181:6, but Detective Ruiz allegedly "told him that it was too late to change his story now," Pl.'s Second Am. Compl. ¶ 45.

9. Uncertain that Hamilton was telling the truth, Stewart, as noted before, did not initially contact the police regarding Hamilton's confession of murdering Cobb. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 4, 14, 46. However, after seeing a local news report a few days later about Cobb's murder, Stewart reported this information to the police. Id.

interview, Hamilton firmly insisted on his innocence, only admitting that he had been with Cobb a few days earlier and had touched his vehicle. *Id.* at 198:11–22; Pl.'s Second Am. Compl. ¶ 47. "According to Hamilton, he had stopped to talk to Robert Cobb the week [before his murder] to get a look at the electronic equipment Cobb kept in his car." Pl.'s Second Am. Compl. ¶ 47. At the conclusion of the interview, the detectives, under the direction of Sergeant Ocegueda, released Hamilton without taking his statement.[10] *See id.*; Terrones Dep. 199:7–9, 203:12–25. Thus, without performing any additional investigation on the case, the El Paso Police Department concluded their investigation into Cobb's murder. Pl.'s Resp. to Defs.' Mot. for Summ. J. 2; Pl.'s Second Am. Compl. ¶ 53; Terrones Dep. 196:20–22.

On June 14, 1994, shortly after the police ceased their investigation, a grand jury in El Paso, Texas indicted Plaintiff for first-degree murder. App. in Support of Defs.' Mot. for Summ. J.H. Consequently, Plaintiff was tried for Cobb's murder in the 168th District Court in El Paso County,[11] Pl.'s Second Am. Compl. ¶¶ 58–60, and was eventually convicted and sentenced to ninety-nine years in prison, App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 47. However, on June 21, 2006, after serving nearly thirteen years in prison, Pl.'s Second Am. Compl. ¶¶ 2, 16, the Texas Court of Criminal Appeals overturned Plaintiff's conviction, *Ex Parte Hernandez*, No. AP–75,445, 2006 WL 1687713 (Tex.Crim.App. June 21, 2006) (per curiam), resulting in

the dismissal of his criminal charges, App. in Support of Defs.' Mot. for Summ. J. Q–S. Following the dismissal of his charges, on June 20, 2008, Plaintiff brought a § 1983 claim against the City of El Paso and several police officers for violations of his civil rights resulting from his wrongful arrest, prosecution, and conviction. Pl.'s Second Am. Compl. ¶¶ 63–85; Defs.' Mot. for Summ. J. ¶ 2.

On September 4, 2008, Defendants moved for summary judgment. Docket No. 33. Therein, Defendants specifically argue (1) that Plaintiff's claims are judicially estopped; (2) that Plaintiff's Fourteenth Amendment due process claim is barred by the statute of limitations because it is actually a Fourth Amendment false arrest claim; (3) that Plaintiff's Fourteenth Amendment claims for (i) failure to investigate, (ii) failure to develop exculpatory evidence, (iii) suggestive identification procedures; and (iv) *Brady* violations fail as a matter of law; (4) that Plaintiff's conspiracy claim under 42 U.S.C. § 1985(3) also fails because he neglected to allege racial or other class-based discrimination; and (5) that Plaintiff cannot avail himself under the laws of the State of Texas for (i) intentional infliction of emotional distress, (ii) malicious prosecution, and (iii) civil conspiracy. Defs.' Mot. for Summ J. ¶ 6. Accordingly, for the reasons discussed below, the Court will grant in part and deny in part the instant motion.

### III. LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court should

---

**10.** The El Paso Police Department eventually obtained a statement from Hamilton regarding his acquaintance with Cobb only after the state prosecutors reviewing Plaintiff's criminal case requested it. Pl.'s Second Am. Compl. ¶ 51.

**11.** The State tried Carreon and Plaintiff separately for Cobb's murder. Defs.' Reply to

Pl.'s Resp. to Defs.' Mot. for Summ. J. ¶ 13. Although Carreon was indicted for murder, the state jury found him guilty of the lesser included offense of aggravated assault, resulting in a sentence of two years' probation. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 47.

find summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists only if there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, "[t]he moving party bears the initial burden of showing that there is no genuine issue for trial; it may do so by 'point[ing] out the absence of evidence supporting the nonmoving party's case.'" *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 712 (5th Cir.1994) (quoting *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir.1990)). If the moving party has satisfied its initial burden, the non-movant must then come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing FED. R. CIV. P. 56(e)). When a moving party requests that a court grant its motion for summary judgment, a court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). While a court will resolve factual controversies or disputes in the non-movant's favor, it must do so "only when there is an *actual* controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid*

*Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (emphasis added). A court should not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

## IV. ANALYSIS

### A. Statute of Limitations

Defendants argue that Plaintiffs Fourteenth Amendment due process claim is barred by the statute of limitations because the claim is actually a false arrest claim under the Fourth Amendment. Defs.' Mot. for Summ. J. ¶ 12. If Defendants are correct, then the statute of limitations would "begin[ ] to run at the time the claimant becomes detained pursuant to legal process.'" *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 127 S.Ct. 1091, 1100, 166 L.Ed.2d 973 (2007)). In this case, because Plaintiff "was detained pursuant to legal process on May 14, 1994," Defendants maintain that Plaintiff's claims are barred by the two-year statute of limitations. *See id.* Plaintiff, on the other hand, argues that "where the [p]laintiff's cause[ ] of action under the Fourteenth Amendment ... impugn[s] his conviction, the applicable [statute of] limitations [is] tolled until that conviction is overturned." Pl.'s Resp. to Defs.' Mot. for Summ. J. 32. The Court agrees.

█ There is no federal statute of limitations for § 1983 claims. *Burrell v. Newsome*, 883 F.2d 416, 418 (5th Cir.1989). For this reason, when considering § 1983 claims, federal courts borrow the forum state's "residual" or "general" personal injury limitations period and applicable tolling provisions.[12] *See Owens v. Okure*, 488

---

12. The Supreme Court has held that where a state, like Texas, provides multiple statutes of

limitations for personal injury actions, courts considering § 1983 claims should adopt the

U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). Accordingly, in Texas, the applicable statute of limitations period is two years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (Vernon 2007).

 Although Texas law governs the limitations period and the tolling exceptions, federal law governs when a plaintiff's cause of action accrues. *Watts v. Graves,* 720 F.2d 1416, 1423 (5th Cir.1983); *Lavellee v. Listi,* 611 F.2d 1129, 1131 (5th Cir.1980). Under federal law, a cause of action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *See, e.g., Gartrell v. Gaylor,* 981 F.2d 254, 257 (5th Cir.1993) (per curiam) (citing *Listi,* 611 F.2d at 1131). However, in § 1983 claims that effectively attack the constitutionality of a conviction or imprisonment, as here, the cause of action does not begin to accrue "until the conviction or sentence [has been] reversed, expunged, invalidated, or *impugned by the grant of a writ of habeas corpus." See, e.g., Heck v. Humphrey,* 512 U.S. 477, 489, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (emphasis added). The Supreme Court imposed this requirement on § 1983 plaintiffs to avoid collateral attacks by plaintiffs on convictions that are still outstanding. *Id.* at 486, 114 S.Ct. 2364. Thus, in this case, Plaintiff's cause of action began to accrue on June 21, 2006, the date when the Texas Court of Criminal Appeals granted his writ of habeas corpus and overturned his conviction. *See Ex Parte Hernandez,* No. AP–75,445, 2006 WL 1687713 (Tex.Crim.App. June 21, 2006) (per curiam). Because Plaintiff commenced this action on June 20, 2008, a day shy of the two-year statute of limitations,

the Court concludes that his Fourteenth Amendment claims are not barred.

**B. Judicial Estoppel**

Defendants next argue that Plaintiff is "judicially estopped from asserting the position of alleged police misconduct in this lawsuit because [it] is contrary to his position in [the habeas] proceeding involving the same evidence and parties." Defs.' Mot. for Summ. J. ¶ 6. In making this claim, Defendants note that "Plaintiff never raised police misconduct as an issue or point of error at any stage of the criminal proceedings that resulted in his 1994 prosecution for murder." *Id.* ¶ 9. Instead, as Defendants point out, "Plaintiff's [w]rit of [h]abeas [c]orpus proceeding was based on ineffective assistance of counsel and factual innocence based on new evidence." *Id.* However, despite Defendants' allegations, the Court finds that application of judicial estoppel is inappropriate in this case.

 "Judicial estoppel is an equitable doctrine that 'prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.'" *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 347 (5th Cir.2008) (quoting *Hall v. GE Plastic Pac. PTE Ltd.,* 327 F.3d 391, 396 (5th Cir.2003)). The salient purpose of the doctrine is to "protect[ ] the essential integrity of the judicial process" by reducing the "risk of inconsistent court determinations," *New Hampshire v. Maine,* 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotations omitted), and "[to] prevent[ ] parties from playing fast and loose with the courts to suit the exigencies of self interest,'" *Supe-*

---

state's "residual" or "general" personal injury limitations period rather than the prescriptive period for enumerated intentional torts. *Owens,* 488 U.S. at 249–50, 109 S.Ct. 573; *compare* TEX. CIV. PRAC. & REM.CODE ANN.

§ 16.002(a) (one-year limitations period for malicious prosecution, libel, slander, and breach of promise to marriage) *with* TEX. CIV. PRAC. & REM CODE ANN § 16.003(a) (two-year limitations period for personal injury).

*rior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 334 (5th Cir.2004) (quoting *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 205 (5th Cir.1999)). When considering whether to invoke this equitable doctrine in a particular case, courts consider (1) whether the party's position was "clearly inconsistent" with its previous one, (2) whether the previous court accepted the party's earlier position, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *See, e.g., New Hampshire,* 532 U.S. at 750–51, 121 S.Ct. 1808. However, "[i]n enumerating these factors," the Supreme Court "[did] not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id.* at 751, 121 S.Ct. 1808. "Additional considerations may inform the doctrine's application in specific factual contexts." *Id.*

■ In this case, the Court declines Defendants' invitation to invoke the doctrine of judicial estoppel. The Court primarily is not convinced that Plaintiff's statements in this case are "clearly" inconsistent with his earlier statements in his habeas proceeding. During his habeas proceeding, Plaintiff claimed, as here, that several police officers engaged in unlawful police practices. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 47. Specifically, Plaintiff contended during his habeas proceeding that "Carreon's identification of [him] was *coaxed* by the improper promise of leniency by police officers." *Id.* (emphasis added). Moreover, Plaintiff argued that Carreon had "signed an affidavit [following his trial, claiming that] his alleged confession [and identification of Plaintiff] to police officers was not given voluntarily." *Id.* In support of these claims, during his

habeas proceeding, Plaintiff referred to the following colloquy from Carreon's criminal trial:

A: [Carreon:] He said, "Just say you did it and I'll let you go. I promise." I had it in my mind. I don't know this guy.

Q: [State:] You don't know what guy?

A: A Mr.—the co-defendant.

Q: You don't know [Plaintiff]?

A: No.

Q: Okay. You just figured, "What the heck. I'll send him up the river?"

A: Basically, yeah. Well, I don't know this guy that—[Detective] Tabullo is saying, "Say he did it. Sign here. I promise I'll let you go." I said to myself, "I don't know this guy. I don't know what he's talking about." I had it in my mind, so—

Q: So did you just make up a guy?

A: No. He showed me a picture.

Q: Detective Tabullo showed you a picture?

A: Yeah.

Q: Okay. Now, you had the benefit of listening to Detective Tabullo didn't you?

A: Yes.

Q: So are you telling the Ladies and Gentlemen [sic] that Detective Tabullo, an 18–year veteran of the El Paso Police Department, lied?

A: Yeah.

*Id.*

Even though the Texas Court of Criminal Appeals ultimately granted Plaintiff's writ of habeas corpus based on ineffective assistance of counsel, it is evident, based on the record above, that Plaintiff raised the issue of police misconduct in his habeas proceeding. Judicial estoppel, as stated before, "generally prevents a party from

prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire*, 532 U.S. at 749, 121 S.Ct. 1808 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)). No such contradiction exists here. Even assuming that Plaintiff's claims are inconsistent, it would be wrong, in the Court's view, to invoke judicial estoppel in this case to essentially derail a potentially meritorious claim, especially when the alleged inconsistency is insignificant at best and there is no evidence of an intent to manipulate or mislead the Court. Because the Court perceives little, if any, threat to the integrity of the judicial process, it resists the application of judicial estoppel in this matter.

## C. Qualified Immunity

Defendants additionally argue that Plaintiff's § 1983 claims for (i) failure to investigate, (ii) failure to develop exculpatory evidence, (iii) suggestive identification procedures; and (iv) *Brady* violations fail as a matter of law because Defendants are entitled to qualified immunity. Defs.' Mot. for Summ. J. ¶¶ 13–33. In particular, Defendants maintain that they are immune from these claims because "they acted reasonably, properly, and in the good faith belief that they were not violating any constitutional right of Plaintiff, were not violating any [statute] of the State of Texas, or clearly established law." Defs.' Orig. Ans. ¶ 62.

Section 1983 provides a cause of action for individuals who have been "deprived of any rights, privileges, or immunities se-cured by the Constitution and laws" of the United States by a person or entity acting under color of state law.[13] 42 U.S.C. § 1983. However, qualified immunity shields state actors performing discretionary functions from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir.2002) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir.2003).

To determine whether a state actor is entitled to qualified immunity, the Court must employ a two-prong test. *Martinez–Aguero v. Gonzalez*, 459 F.3d 618, 621 (5th Cir.2006). First, the Court must evaluate whether "in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, the Court then "consider[s] whether the [officer]'s actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir.2007). "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir.2000). This means that even law enforcement officials who "reasonably

---

**13.** Title 42 U.S.C. § 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

but mistakenly [commit a constitutional violation]" are entitled to immunity. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir.2001).

 When public officials, as here, plead the affirmative defense of qualified immunity, it is the plaintiff's burden to overcome the defense by establishing that the officials' alleged conduct violated clearly established law. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir.2005). The plaintiff may not rely on conclusory allegations and assertions. *Id.* Instead, the plaintiff must show genuine issues of material fact about the reasonableness of the officials' alleged conduct. *Id.*

### 1. Impermissibly Suggestive Identification

Plaintiff initially argues that his right to due process was violated because the pretrial identification procedure used by Defendants on Carreon and Echemendia was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Pl.'s Resp. to Defs.' Mot. for Summ. J. 6 (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Defendants generally respond that there is no evidence in this case that Defendants manipulated Echemendia's eyewitness identification "by use of threats, coercion, [or by] revealing key information." Defs.' Mot. for Summ. J. ¶ 33. Additionally, Defendants contend that Plaintiffs due process rights were not infringed since Carreon's pretrial identification "was [not] used or introduced into evidence" at Plaintiffs criminal trial. *See id.*

 "[A] suggestive pre-indictment identification procedure does not, in itself, intrude upon a constitutionally protected interest." *Manson v. Brathwaite*, 432 U.S. 98, 113 n. 13, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). "Pretrial identification procedures are constitutional unless the pretrial identification was so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law." *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir.1990) (citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). The Court's examination into the reliability of eyewitness identifications proceeds in two stages. *Id.* Initially, as a threshold inquiry, the Court must determine whether the pretrial identification was impermissibly suggestive. *Joshua v. Maggio*, 674 F.2d 376, 378 (5th Cir.1982). If it was, then the Court must determine whether, "under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification." *Herrera*, 904 F.2d at 946. Under the second step of the analysis, the Supreme Court has identified five factors that may help determine the likelihood of irreparable misidentification: (1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Such an analysis is a mixed question of law and fact. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir.1997); *see also Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) ("[T]he ultimate question as to the constitutionality of the pretrial identification procedures ... is a mixed question of law and fact ....."). Having thus delineated this two-tiered test, the Court now turns to its application here.

### a. Echemendia

█ The Court's initial task, as outlined above, is to determine whether Echemendia's pretrial identification of Plaintiff was impermissibly suggestive. As noted earlier, Echemendia identified Plaintiff as Carreon's accomplice in Cobb's murder from a six-person photographic line-up prepared by Detective Terrones. Pl.'s Second Am. Compl. ¶ 40; Terrones Dep. 213:8–10; Martinez Dep. 166:14–18. As a result of Echemendia's pretrial identification, Defendants arrested Plaintiff. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 12, 16. Even though Plaintiff contends that this identification procedure was impermissibly suggestive, the Court finds Plaintiffs claim untenable.

Before providing Echemendia the six-person photographic lineup, Detective Martinez, as evidenced by his police report, admonished Echemendia, explicitly stating that Plaintiff may or may not be present in the photographic lineup. Martinez Dep. 161:18–162:16.

> Before [Echemendia] was shown the line up, [Echemendia] was told that the photographs that he was going to be shown might or might not show one of the persons who were involved in the incident. The detective gave the witness a verbal [a]dmonishment statement. [Echemendia] then viewed the line up. [Echemendia] looked at all of the photographs and picked out the photograph that was in slot number 5. [Echemendia] then told the detectives that the person who the witness had pointed out was the person who he referred to as the Latin male in his statement. [Echemendia] then signed and dated the back of the photograph that [he] had pointed out.

App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 25. Nothing from this statement reveals that Plaintiff's pretrial identification was impermissibly suggestive.

Plaintiff's arguments to the contrary are unpersuasive. In an attempt to rebut Defendants' claim, Plaintiff merely asserts, to no avail, that Echemendia's pretrial identification is "disturbing" because (1) Plaintiff "was not involved in Cobb's murder" and (2) "the only reason Defendants had for putting Plaintiff's picture in the lineup was because Plaintiff was associated with [Hernandez], who was associated with Carreon." Pl.'s Resp. to Defs.' Mot. for Summ. J. 21. Even if the Court were to review these facts in a light most favorable to Plaintiff, *see Reid*, 784 F.2d at 578, Plaintiff has failed to come forward with "specific facts showing that there is a genuine issue" that the six-person photographic lineup that Defendants presented to Echemendia was impermissibly suggestive, *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

█ Nevertheless, even assuming *arguendo* that Defendants' photographic lineup was unduly suggestive, the Court finds, under the totality of the circumstances, that the alleged suggestiveness in this case did not lead to a substantial likelihood of irreparable misidentification. As noted at the outset, to ascertain whether an identification led to a substantial likelihood of irreparable misidentification, courts generally look to five established factors: (1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *United States v. Merkt*, 794 F.2d 950, 959 (5th Cir.1986). Two days after Cobb's murder, Echemendia provided a statement to Defendants, rendering an approximate description of Plaintiff as well as a detailed

account of his surroundings.[14] Additionally, Echemendia seemed to be relatively near the crime scene and thus had ample opportunity to view the perpetrator. Also, Echemendia's vivid statement to the police reveals a high degree of attentiveness during the ordeal. Accordingly, the Court finds that the factors above, taken together, show that any alleged suggestiveness in Plaintiff's identification did not lead to a substantial likelihood of irreparable misidentification.

### b. Carreon

Next, Plaintiff contends that Defendants' one-on-one show-up identification of Plaintiff to Carreon was inherently suggestive. Pl.'s Resp. to Defs.' Mot. for Summ. J. 23 (citing *Neil v. Biggers*, 409 U.S. 188, 196–98, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). "Suggestive confrontations," as here, "are [widely] disapproved because they increase the likelihood of misidentification...." *Neil*, 409 U.S. at 198, 93 S.Ct. 375; *see also Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Indeed, the Fifth Circuit has consistently admonished officers for using the practice of show-up identifications. *See Joshua*, 674 F.2d at 378 ("It is an understatement to say that 'the practice of showing suspects singly to persons for the purpose of identification ... has been widely condemned.'") (quoting *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)); *see also Allen v. Estelle*, 568 F.2d 1108, 1112 (5th Cir.1978) ("This Court, along with other circuits, has shown reluctance to encourage the use of showups.") (footnote omitted). Although Defendants concede that they showed Carreon one photograph of Plaintiff instead of a photographic lineup, they claim, as stated before, that the identification procedure was not impermissibly suggestive. Tellingly, Detective Terrones stated that Detective Ruiz, acting pursuant to police procedures, properly provided Carreon a single photograph of Plaintiff because Carreon had already identified Plaintiff by his presumed nickname.

A: [Detective Terrones:] So at one point, since [Carreon is] saying "Guero, Guero," and he really doesn't know his name, he's shown *one photograph* of [Plaintiff], and he says, "This is the Guero that I'm referring to in my statement." Okay. And—

Q: [Plaintiff's counsel:] Why did they— why did you guys show him one photograph of [Plaintiff]?

A: Because he said he knew him for several months. So he knows this person, maybe not by name, but with the photograph—

---

**14.** Echemendia's statement to Defendants provided, in relevant part:

> What I saw happened at about 1:30 a.m. early Wednesday morning, 05–11–1994. On that early morning, I was outside of the shop at 9411 Dyer. I was standing [at the southwest corner of] the car wash, [which] is located in the same shopping strip where I work at ... At about that time I saw the three males standing outside of the [v]eterinary shop that is located on the corner of Dyer and Diana.
>
> \* \* \*
>
> The other male was [Plaintiff], a Latin male, 23 to 24 years of age, light brown hair that was very short on the top and on the sides, little facial hair and was wearing beige Khaki type pants that were very baggy, blue button down shirt with long sleeves that was tucked into the pants, but was very loose, and was about three sizes too big for this male.

App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 26.

Terrones Dep. 129:12–21 (emphasis added).

Detective Ruiz, the detective responsible for providing Carreon with a single photograph of Plaintiff, shares Detective Terrones's recollection:

Q: [Plaintiff's counsel:] Okay. So when you went to speak to Carreon, [Detective] Tabullo had already been speaking to him?

A: [Detective Ruiz:] I believe—my recollection is that Detective Tabullo had already obtained a confession statement from Carreon.

Q: And then what was your involvement at that point with Carreon?

A: I was to show him a photograph of a—of an individual that was possibly Guero.

Q: And whose photograph was that?

A: That was [Plaintiff].

\* \* \*

Q: ... This showing a single photograph to Carreon, would you consider that a one-to-one identification?

A: In a sense, yeah.

\* \* \*

Q: Whose decision was it, if you know, to conduct this identification of [Plaintiff] with Carreon? Was that your decision?

A: Recalling back, I believe it was Sergeant Ocegueda that instructed me to meet with Carreon and present him with a photograph, to see if he could identify the person in the photograph.

\* \* \*

Q: Okay. So your understanding was, at this point, Carreon had described an individual as being with him during the murder, correct?

A: That is correct.

\* \* \*

Q: When you met with Carreon, what did you say to Carreon?

A: I met with Carreon. I readvised him of his rights, ongoing rights, and I asked him to view this photograph and to let me know if he knew the person in that photo.

Ruiz Dep. 71:5–15, 73:23–74:1, 74:24–75:5, 77:20–23.

However, contrary to the allegations of Detectives Terrones and Ruiz, Carreon stated, in an affidavit, that the detectives coerced him into misidentifying Plaintiff:

On May 13, 1994, I was arrested for murder. At the time, I was seventeen (17) years old. It was the first time in my life I had ever been arrested or questioned by police ... *The police coerced me into signing a false confession and misidentifying [Plaintiff] with promises that if I did, I would be released.* A detective showed me one picture and told me, "This is Mr. Hernandez. This is Guero, just signed the back of the picture and we'll let you go.

I tried telling the detective that I did not know Mr. Hernandez and that I has [sic] not seen him kill anyone. However, the detective became angry repeatedly saying that Mr. Hernandez was Guero. I did not know Mr. Hernandez, so I figured the police knew it was him. I wanted to be released, so I signed the picture. I honestly believed the police would let me go. I saw Mr. Hernandez for the first time ever in the picture detective showed me. Prior to that day, I had never seen Mr. Hernandez before ... Ever since the conviction of Mr. Hernandez, I have lived with the uncomfortable thought that my involuntary statement and misidentification may

have played a role in the imprisonment of an innocent man.

App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 6 (emphasis added).

Accordingly, after juxtaposing Carreon's affidavit with the depositions of Detectives Terrones and Ruiz, the Court finds that there is a genuine issue of material fact as to whether the pre-indictment identification procedure was impermissibly suggestive. Because the Court must review the facts drawing all inferences most favorable to the non-movant, the Court resolves this factual issue in Plaintiff's favor. *Reid,* 784 F.2d at 578.

■ While the indicia of suggestiveness appears to point in Plaintiff's favor, the Court must now determine whether Defendants' suggestiveness led to a substantial likelihood of irreparable misidentification. The Court concludes that it does. After Carreon's initial confession, Detective Ruiz, under the direction of Sergeant Ocegueda, returned to Carreon and showed him a single photograph of Plaintiff. Pl.'s Second Am. Compl. ¶ 44; App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 23. According to Carreon, Detective Ruiz "placed the picture in front of him and specifically instructed him: 'This is Mr. Hernandez. This is ["Guero"], just sign the back of the picture and we'll let you go.'"[15] Pl.'s Resp. to Defs.' Mot. for Summ. J. 23. Nevertheless, contrary to Defendants' assertion, Plaintiff argues that

his bona fide nickname, as evidenced by the police's records management system, was "Gato"—not "Guero."[16] *See id.* at 22.

Q: [Plaintiff's counsel:] Could you explain to the Court what Exhibit 2 is, [Detective] Terrones?

A: [Detective Terrones:] It's an arrest supplement.

\* \* \*

Q: Under "suspect's name," what did you write?

A: Nickname and the name of "Gato."

Q: Above that, "suspect's name"?

A: "Hernandez, Alejandro."

\* \* \*

Q: Where did you get "Gato"?

A: From the [police's records management system].

Q: Why not "Guero"?

A: I have no idea.

Q: I mean your chief witness here is calling him "Guero."

A: Right.

\* \* \*

Q: If I were able to provide witnesses that—that knew [Plaintiff] and said, "He was not known by the name of 'Guero.' Everybody I knew that knew [Plaintiff] knew him by 'Gato;' nobody knew him by the name of

---

15. Detective Ruiz, contrary to Carreon and Plaintiff's allegations, denies having coerced Carreon into misidentifying Plaintiff:

Q: [Plaintiff's counsel:] And if Carreon were to testify that you told him, "This is Guero, isn't it," you—would dispute that testimony?

A: [Detective Ruiz:] I would say he's lying, yes, sir.

Ruiz Dep. 81:10–82:2.

16. In addition to the police's records management system, Hernandez, the man who the

police had previously arrested for attempting to shoplift a pair of jeans at a Mervyn's Department Store with Plaintiff, knew Plaintiff as "Gato."

I met [Plaintiff] in 1994 . . . In all the time I knew [Plaintiff] I never knew him to be known by the name "Guerro" [sic] instead everyone called him "Gato" because of his eyes.

App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 2

'Guero,'" would you be able to provide any witnesses, as we sit here today, that could tell me they knew [Plaintiff] by the name of "Guero"?

\* \* \*

A: I don't have any knowledge of anybody else.

Terrones Dep. 129:12–21, 132:15–136:2.

The record, when construed in a light most favorable to Plaintiff, reveals that Plaintiff's identification was unreliable since his presumed nickname, as Detective Terrones apparently admits, was "Gato"—not "Guero." Accordingly, the Court concludes that Defendants' pretrial identification procedure was, when viewed under the totality of the circumstances, impermissibly suggestive because Defendants strong-armed Carreon into misidentifying Plaintiff and gave rise to a substantial likelihood of irreparable misidentification.

**2. Reckless Investigation**

Plaintiff subsequently alleges that Defendants deprived him of his liberty without due process of law by conducting a reckless investigation and deliberately ignoring exculpatory evidence in his underlying criminal case. Pl.'s Resp. to Defs.' Mot. for Summ. J. 8 (citing *Sanders v. English,* 950 F.2d 1152, 1162 (5th Cir. 1992)). Defendants underscore that "[d]ue process does not require that every conceivable step be taken at whatever cost to eliminate the possibility of convicting an innocent person." Defs.' Mot. for Summ. J. ¶ 26 (citing *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)).

■■■ As a preliminary matter, the Court is mindful that there does not exist a cognizable tort claim for a police's negligent failure to investigate. *Sanders,* 950 F.2d at 1161–62; *United States v. Martin,* 615 F.2d 318, 329 (5th Cir.1980) (noting that negligence does not constitute a viola-tion of a clearly established constitutional right). In fact, once police establish probable cause, as here, the police are neither required to "investigate independently every claim of innocence," nor compelled "by the Constitution to perform an error-free investigation of such a claim." *Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). However, an official may be exposed to liability under § 1983 if he deliberately ignores exonerative evidence or conducts a reckless investigation. *Sanders v. English,* 950 F.2d 1152, 1162 (5th Cir.1992).

■■■ In this case, Plaintiff has adduced evidence showing, as illustrated above, that Defendants hectored Carreon into implicating Plaintiff by promising to release him if he identified Plaintiff as his accomplice. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 6. Moreover, Carreon, in support of Plaintiff's claim, states that Detective Tabullo fabricated his confession to the police.

The so-called confession which became my alleged statement was totally fabricated by [Detective] Tabullo. He wrote the statement then typed it. He kept telling me just agree to the statement and sign it and I promise I'll let you go. He then brought in Detectives Terrones and Ruiz. After I signed the statement, [Detective] Tabullo put the handcuffs on me. I said I thought you were going to let me go. [Detectives] Terrones, Ruiz, and Tabullo started laughing at me. I felt betrayed because I knew [Detective] Tabullo had lied to me about letting me go. They then took me to a bench and sat me next to [Plaintiff].

*Id.* at 45.

Besides this seemingly reckless behavior, Plaintiff avers that, after Carreon saw Plaintiff for the first time, Carreon insisted to Detectives Terrones and Ruiz that he

did not know him, Terrones Dep. 180:25–181:6; however, the detectives seemingly ignored his plea, Pl.'s Second Am. Compl. ¶ 45.

Q: [Defendants' counsel:] Did you—I understand it's your position that when you were in the backseat of the patrol car—mean, the detectives' car, and Detective Terrones and Detective Ruiz were driving you from—you know what "Five Points" means, right?

A: [Plaintiff:] Yes, sir.

Q: And they were driving you from Five Points down to where the municipal court judges are, that [Carreon] said, "I don't know this guy. This isn't Guero." Did he say that?

A: Something to that effect. He said, "This isn't him."

Q: Okay. And did these detectives respond?

A: Detect—you know, at first I couldn't tell who was who, because I hadn't seen them.

Q: Right. We've been here—

A: But now that I've seen them—

Q: We're on our fourth day here.

A: It was Detective Ruiz.

Q: What did he say?

A: Detective Terrones didn't say anything.

Q: Okay.

A: He stayed quiet, you know, act like—he just ignored it, what, you know, Carreon was saying.

Q: Okay.

A: Detective Ruiz said, you know, "That's something you're going to—you can't—you can't change it anymore. That's something you're going to have to tell the judge." That's what he said.

Pl.'s Dep. 30:14–31:17.

Although Detective Ruiz adamantly denies Plaintiff's allegation or simply does not recollect Carreon notifying him of his inability to recognize Plaintiff,[17] the Court, merely for purposes of this motion, must draw these statements in a light most favorable to Plaintiff. Viewed in that context, the Court therefore concludes that the facts alleged by Plaintiff are sufficient to make out a cognizable claim of reckless investigation.

### 3. Failure to Disclose *Brady* Exculpatory Evidence

Furthermore, Plaintiff alleges that Defendants cannot avail themselves of qualified immunity because they failed to disclose *Brady* exculpatory evidence relating to (1) the lack of association between Carreon and Plaintiff, (2) the collusive origin of Carreon's confession and identification, and (3) Carreon's presumed recantation. Pl.'s Resp. to Defs.' Mot. for Summ. J. 15–17, 24. The Court agrees.

---

**17.** Detective Ruiz, as mentioned above, claims he has no knowledge of Carreon's recantation:

> Q: [Plaintiff's counsel:] Okay. And at—at any time while you were with Carreon, after he signed the confession, did he tell you, "You know what? I don't know [Plaintiff]"?
> A: [Detective Ruiz:] No, sir.

> Q: At any time that evening, after he signed the confession, did he recant that confession to you?
> A: No, sir.
> Q: At any time while you were with Carreon, after he signed that confession, did you overhear a conversation between Carreon and [Plaintiff] where Carreon might have told him, "I don't know you"?
> A: No, sir, not to my recollection.
> Ruiz Dep. 83:16–84:3.

Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government may not withhold evidence that is favorable to a criminal defendant. *United States v. Walters,* 351 F.3d 159, 169 (5th Cir.2003). This constitutional mandate rightfully extends to police officers.[18] *See, e.g., Geter v. Fortenberry,* 849 F.2d 1550, 1559 (5th Cir.1988) (holding that "a police officer cannot avail himself of a qualified immunity defense if he ... deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles"); *see also Brown v. Miller,* 519 F.3d 231, 237–38 (5th Cir. 2008). As such, to establish a *Brady* violation, a criminal defendant must show (1) that the police suppressed evidence; (2) that the evidence was favorable, such as exculpatory or impeachment evidence; and (3) that the evidence was material. *See Mahler v. Kaylo,* 537 F.3d 494, 499–500 (5th Cir.2008). Moreover, a criminal defendant must establish that his failure to discover the evidence was not the result of a lack of due diligence. *See United States v. Mulderig,* 120 F.3d 534, 541 (5th Cir. 1997); *United States v. Marrero,* 904 F.2d 251, 261 (5th Cir.1990). Where a criminal defendant fails to establish any one element of *Brady,* courts need not inquire into the other components. *See United States v. Runyan,* 290 F.3d 223, 245 (5th Cir.2002); *United States v. Hughes,* 230 F.3d 815, 819 (5th Cir.2000).

▮ Of the *Brady* components illustrated above, materiality "is generally the most difficult to prove." *Mahler,* 537 F.3d

at 500. In assessing materiality, courts must determine "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Sipe,* 388 F.3d 471, 478 (5th Cir.2004) (quoting *Strickler v. Greene,* 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). The Fifth Circuit has summarized this materiality inquiry as follows:

> [t]he Supreme Court has imposed four criteria for determining whether evidence is material. First, materiality does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal. Second, he need not weigh the withheld evidence against the disclosed evidence to show he would have been acquitted by the resulting totality. Third, if evidence is found material, there is no need to conduct a harmless error analysis. Fourth, the withheld evidence should be considered as a whole, not item-by-item.

*DiLosa v. Cain,* 279 F.3d 259, 263 (5th Cir.2002) (citing *Kyles v. Whitley,* 514 U.S. 419, 434–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Indeed, "[t]he sum of these four guideposts means that, to show a due process violation when the state withholds evidence, a defendant need not prove that his trial necessarily would have had a different outcome; a lack of faith in the result is sufficient." *Id.* As such, materiality depends largely on the value of the suppressed evidence relative to evidence

---

**18.** Although the Supreme Court has not directly addressed this issue, several circuit courts, including the Fifth Circuit, have found it to be a violation of procedural due process where police withhold exculpatory evidence from prosecutors. *See generally Villasana v. Wilhoit,* 368 F.3d 976, 980 (8th Cir.2004), *cert. denied* 543 U.S. 1153, 125 S.Ct. 1345, 161 L.Ed.2d 117 (2005); *Newsome v. McCabe,*

256 F.3d 747, 752 (7th Cir.2001); *Jean v. Collins,* 221 F.3d 656, 659 (4th Cir.2000) (Wilkinson, C.J., concurring) (en banc); *McMillian v. Johnson,* 88 F.3d 1554, 1569 (11th Cir.1996), *cert. denied* 521 U.S. 1121, 117 S.Ct. 2514, 138 L.Ed.2d 1016 (1997); *Walker v. New York,* 974 F.2d 293, 299 (2d Cir.1992); *Brady v. Dill,* 187 F.3d 104, 114 (1st Cir.1999).

that the government disclosed. *Sipe*, 388 F.3d at 478. The reviewing court applies the materiality inquiry to the withheld evidence "collectively, not item by item." *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555.

In this case, acting initially on a mere "hunch," [19] Detective Terrones linked Plaintiff to Cobb's murder. Terrones Dep. 188:5–22. In making this connection, Detective Terrones associated Plaintiff with Hernandez, the man who police had previously arrested for attempting to shoplift a pair of jeans at a Mervyn's Department Store with Plaintiff. Pl.'s Second Am. Compl. ¶ 32. Since Hernandez was associated with Carreon, Detective Terrones then assumed that Plaintiff, by way of association, also knew Carreon. Pl.'s Resp. to Defs.' Mot. for Summ. J. 15–16. After making this recondite connection, Detective Terrones, along with Detective Zimmerly, went to the El Paso County Detention Facility to interview Hernandez. Zimmerly Dep. 58:1–8. At the completion of the interview, Detective Zimmerly made a report. App. in Support of Defs.' Mot. for Summ. J.G. Plaintiff argues that "[Detectives] Terrones and Zimmerly were well aware [that] Plaintiff and his then-alleged accomplice, [Carreon], did not know each other." Pl.'s Resp. to Defs.' Mot. for Summ. J. 15. Plaintiff goes on to say that Hernandez, "[t]he very individual [Detective] Terrones used to connect Plaintiff

and Carreon informed Defendants of this fact, but this information is conspicuously absent from [Detective] Zimmerly's report...." *Id.* at 15–16. Hernandez, by affidavit, endorses Plaintiff's allegation, stating in relevant part:

> The white detective started by telling me that [Plaintiff] and [Carreon] had been arrested for capital murder ... That shocked me when the detective put those two names together and I knew the detective was lying to me. *I told the detective that couldn't be true because I knew both [Plaintiff] and [Carreon] but I knew for a fact that [Plaintiff] and [Carreon] did not know each other....*

App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. 2 (emphasis added).

Defendants offer no direct rejoinder to this allegation. The Court therefore is left to determine whether this exculpatory evidence is material. As Supreme Court precedent directs, the Court proceeds with an evaluation of "the tendency and force of the undisclosed evidence." *Id.* at 437 n. 10, 115 S.Ct. 1555. A review of the withheld evidence reveals that disclosure of Hernandez's statement "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441, 115 S.Ct. 1555. Had Defendants honored their *Brady* obligations by disclosing Hernandez's complete statement, then the val-

---

**19.** The record in this case establishes that Defendants myopically focused on Plaintiff's prior arrest for stealing a pair of jeans with Hernandez and drew inferences from that association.

> Q: [Plaintiff's counsel:] Okay. You don't have any indication—under the Mervyn's Department Store, where [Plaintiff] is—is associated with him, that that was violent in any way, do you?
> A: [Detective Terrones:] No.
> Q: And yet, you chose to—to take and pull [Plaintiff's] name out of here for a shoplifting charge ... ?

> A: Yes.
> Q: And as you ... sit here today, can you tell the Court why you chose [Plaintiff] ... ?
>
> * * *
>
> A: A hunch maybe. I don't know.
> Q: A hunch? But you don't know for sure?
> A: No.

Terrones Dep. 188:5–22.

ue of Echemendia's eyewitness testimony would have been substantially reduced, if not obliterated. That is to say, if Defendants had disclosed Hernandez's statement that Plaintiff and Carreon had never met, then Echemendia's eyewitness statement implicating both to Cobb's murder would have been undermined. Moreover, the demise of Echemendia as a credible prosecution witness would have done more than just nullify his testimony; it would also have served to discredit generally the police methods employed in assembling the case against Plaintiff, calling into question the veracity of testimony of other prosecution witnesses. As the Fifth Circuit aptly explained, the consequences of destroying one eyewitness, as Echemendia, extend beyond just that witness:

> We are tempted, but not persuaded, by this arithmetical approach; our experience at the bar has been that positive identification by two unshaken witnesses possesses many times the power of such an identification by one only, and that the destruction by cross-examination of the credibility of one of two crucial witnesses—even if other remains untouched—may have consequences for the case extending far beyond the discrediting of his own testimony.

*Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir.1985).

Since there was no physical evidence linking Plaintiff to Cobb's murder, the entire criminal case against Plaintiff mainly consisted of Echemendia's eyewitness account. Terrones Dep. 196:23–197:20, 216:8–14. Because the criminal case against Plaintiff relied almost exclusively on eyewitness identification, the materiality of Hernandez's statement, which calls into question Echemendia's eyewitness testimony, compels a materiality finding. The withheld evidence need not touch every prosecution witness and every item of incriminating evidence before materiality is satisfied. To be sure, "the effective impeachment of *one eyewitness* can call for a new trial even though the attack does not extend directly to others." *Kyles*, 514 U.S. at 419, 115 S.Ct. 1555 (citing *United States v. Agurs*, 427 U.S. 97, 112–13 n. 21, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)) (emphasis added). Thus, considering the withheld evidence as a whole, the Court concludes that Hernandez's statement is material.

However, the Court's inquiry is not finished. Plaintiff further contends that Defendants also failed to disclose *Brady* evidence relating to Carreon's presumed recantation. Pl.'s Resp. to Defs.' Mot. for Summ. J. 15–17; Pl.'s Dep. 30:14–31:17. Defendants, by virtue of Detective Terrones's statement, apparently acknowledge that, if Carreon recanted his identification of Plaintiff as his purported accomplice, then this would indeed be *Brady* material.

Q: [Plaintiff's counsel:] So if [Carreon], the co-defendant, turns around and says, "You know what? Now that I'm in the car with him, and I'm looking at him, I'm telling you, this is not the guy. This is not—I don't know this person." Now, is that information that would tend to show that he's innocent?

A: [Detective Terrones:] No.

Q: Now, let me ask you—I'm not asking would you tend to believe he's innocent, but *could you see where a jury might take that as evidence of his innocence?*

A: *They could.*

Q: *So, then, if a jury could consider that as being part of evidence of-of a person's innocence, then is that exculpatory?*

A: *It could be, yes.*

 * * *

Q: [N]owhere in the paperwork can you find where any detective documented or reported [Carreon] saying, "I don't know [Plaintiff]"?

A: That is correct.

Q: And you have no information or no evidence today to show that that information would have been given to prosecutors, that if [Carreon] said that—and I understand we're not establishing today that [Carreon] did say it or didn't say it—but if [Carreon] said it, you have no indication that that information was ever given to prosecutors?

A: Yes.

Terrones Dep. 137:23–138–12, 182:25–183–11 (emphasis added).

Even though the parties sharply dispute whether Carreon actually recanted his identification of Plaintiff, the Court is obliged to construe the facts in Plaintiffs favor. Given this finding, the Court concludes that Carreon's presumed recantation is exculpatory and, like Hernandez's statement, also material.

## D. Civil Conspiracy

■■■ Next, Plaintiff alleges that Defendants' actions "were motivated by a class-based animus [that resulted in the] conscious and deliberate choice to proceed with the investigation and prosecution [against Plaintiff] over reliable leads that indicated a third Caucasian person was involved." Pl.'s Resp. to Defs.' Mot. for Summ. J. 9–10. To state a colorable claim under 42 U.S.C. § 1985(3),[20] a plaintiff must demonstrate (1) the existence of a conspiracy, (2) for the purpose of depriving a person or class of persons of equal protection of the laws in a state court proceeding, (3) an act in furtherance of a conspiracy, and (4) an injury to persons or property or a deprivation of a right or privilege granted to U.S. citizens. *United Bhd. of Carpenters and Joiners of Am. Local 610 AFL–CIO v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352; 77 L.Ed.2d 1049 (1983). In so doing, a plaintiff must also show that the conspiracy was motivated by a class-based animus. *Horaist v. Doctor's Hosp. of Opelousas,* 255 F.3d 261, 271 (5th Cir.2001) (citing *Bryan v. City of Madison,* 213 F.3d 267, 276 (5th Cir.2000)).

In this case, Plaintiff has adduced no evidence that Defendants' actions were motivated based on his membership in a

---

20. Although Plaintiff couches his claim under § 1985(2), it seems, based on his pleadings, that he actually intends to bring a claim under § 1985(3). Section 1985(2) addresses conspiracies to interfere with proceedings in federal court, while § 1985(3) addresses conspiracies to deprive a person of the equal protection of the law, or equal privileges and immunities under the law, when such conspiracies are motivated by racial animus. *See, e.g., Deubert v. Gulf Fed. Sav. Bank,* 820 F.2d 754, 757 (5th Cir.1987) (citing *Daigle v. Gulf State Util. Co., Local 2286,* 794 F.2d 974, 978–79 (5th Cir.1986)). Section 1985(3) reads in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws ... or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

protected class of persons. *Scott,* 463 U.S. at 835, 103 S.Ct. 3352 (" 'The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.") (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Although Plaintiff claims that Defendants' actions were "motivated by a class-based animus [since they] failed to investigate leads that would have implicated a Caucasian male," Pl.'s Resp. to Defs.' Mot. for Summ. J. 34–35, Plaintiff furnishes no support for this conclusory allegation, *Harris v. Ashby,* 2001 U.S. Dist. LEXIS 12113, at *17 (N.D.Tex. Mar. 5, 2001) (finding that conclusory allegations of a race-based conspiracy are insufficient to support a viable § 1985(3) claim). Without evidence showing otherwise, the Court is unpersuaded that Defendants, a group of Mexican–American police officers, harbored any racial animus towards Plaintiff, a Mexican–American.[21] Thus, Plaintiff's conspiracy claim lacks any factual support that Defendants, motivated by racial animus, conspired to deprive Plaintiff of equal protection under the laws. Accordingly, the Court dismisses Plaintiff's § 1985(3) conspiracy claim.

### E. State Law Claims

Turning to state law, Plaintiff originally brought state law claims of intentional infliction of emotional distress,[22] malicious prosecution,[23] and civil conspiracy.[24] Pl.'s First Am. Compl. ¶¶ 81–90. Since the filing of Defendants' motion for summary judgment, Plaintiff's remaining state law claim is for civil conspiracy. Pl.'s Second Am. Compl. ¶¶ 79–83.

#### 1. Civil Conspiracy

▆ The elements of a civil conspiracy claim in Texas are: "(1) two or more persons; (2) an object to be accomplished; (3)

---

**21.** Moreover, the record is similarly devoid of any evidence tending to show the existence of a conspiracy. Mere conclusory allegations of the existence of a conspiracy are insufficient to support a claim of federal conspiracy. *Priester v. Lowndes County,* 354 F.3d 414, 420 (5th Cir.2004); *see also Lynch v. Cannatella,* 810 F.2d 1363, 1369–70 (5th Cir.1987) ("Plaintiffs who assert conspiracy claims under civil rights statutes must plead the *operative facts* upon which their claim is based. Bald allegations that a conspiracy existed are insufficient.") (emphasis added). Plaintiff has failed to prove that the alleged co-conspirators agreed, either expressly or tacitly, to commit acts to deprive him of equal protection under the law. *Garrison v. City of Texarkana, Texas,* 910 F.Supp. 1196, 1207 (E.D.Tex.1995) ("To prove the existence of a conspiracy under this statute, the plaintiff must allege and establish facts showing a meeting of the minds.").

**22.** On November 6, 2008, Plaintiff filed his "Second Amended Complaint and Jury Demand." Docket No. 65. Because Plaintiff apparently dropped his state law claim for intentional infliction of emotional distress in his Second Amended Complaint, the Court will not consider it.

**23.** As previously noted, on October 27, 2008, the Court dismissed Plaintiff's malicious prosecution claim. *See supra* note 3.

**24.** "Texas law of official immunity is substantially the same as federal qualified immunity law." *Wren v. Towe,* 130 F.3d 1154, 1160 (5th Cir.1997). Under Texas law, law enforcement officers are entitled to official immunity for conduct that is "(1) within the scope of their authority (2) in performing their discretionary duties (3) in good faith." *Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424 (Tex.2004). An officer's decision to arrest is discretionary. *City of Lancaster v. Chambers,* 883 S.W.2d 650, 654 (Tex. 1994). An officer acts with good faith when "a reasonably prudent officer, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred." *Telthorster v. Tennell,* 92 S.W.3d 457, 465 (Tex.2002).

a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). A plaintiff asserting such a claim must prove that the defendants conspired to accomplish an unlawful purpose or used unlawful means to accomplish a lawful purpose. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex.1996).

 Government officials in Texas are officially immune from liability for the performance of their (1) discretionary duties (2) in good faith (3) as long as they are acting within the scope of their authority. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). A discretionary function—as distinguished from a ministerial duty, which requires rote obedience to orders or performance of a function to which the actor has no choice—involves personal deliberation, decision, and judgment. *Id.* at 654 (citation omitted). An officer acts in good faith if a reasonably prudent officer, under the same circumstances, could have believed that his actions were correct. *Id.* at 656. An officer acts within the scope of his authority when he discharges the duties generally assigned to him. *Id.* at 658. To obtain official immunity on summary judgment, an official must prove that a reasonably prudent official might have believed that his action was appropriate under the circumstances. *Id.* Even if an official's actions were taken negligently, that would not be sufficient to defeat a showing of good faith. *Id.* at 655. The test for good faith is objective and is substantially derived from the test for good faith in a

qualified immunity claim for federal constitutional violations. *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 413 (5th Cir.2002).

In light of the Court's holding that Defendants are immune from Plaintiff's § 1985(3) conspiracy claim, the Court also determines, by conducting the analogous state law inquiry under Texas state law, that Defendants are likewise immune from Plaintiff's state law conspiracy claim.

## V. CONCLUSION

Based on the foregoing, the Court is of the opinion that Defendant's motion for summary judgment should be granted in part and denied in part. In this vein, the Court concludes that Plaintiff's state and federal claims for civil conspiracy should be dismissed.

Accordingly, **IT IS ORDERED** that Defendants' "Motion for Summary Judgment" (Docket No. 33) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Defendants' "Motion to Strike Affidavit and to Exclude Plaintiffs [sic] Expert Witness Troy Wilke" (Docket No. 76) is **DENIED AS MOOT.**[25]

**IT IS FINALLY ORDERED** that Plaintiff's "Motion to Strike Certain Opinions of the Affidavit of Defendants' Expert Witness Robert Taylor" (Docket No. 79) is **DENIED AS MOOT.**

---

25. Because the parties' expert affidavits are immaterial to the disposition of this Order, the Court denies them as moot. However, regarding Defendants' "Motion to Strike Affidavit and to Exclude Plaintiffs [sic] Expert Witness Troy Wilke," the Court notes that it only denies as moot the portion of Defendants' motion that relates to their request to strike Troy Wilke's affidavit. The remaining portion of Defendants' motion pertaining to their request to strike Troy Wilke as an expert witness is denied without prejudice to its refiling.