# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2266

_____

| | | |
|---|---|---|
| Armand Villasana, Jr., | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Weldon Wilhoit, et al., | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: January 14, 2004
Filed: June 1, 2004

_____

Before LOKEN, Chief Judge, FAGG and BOWMAN, Circuit Judges.

_____

LOKEN, Chief Judge.

After Armand Villasana was tried and convicted of kidnaping, rape, and sodomy in a Missouri state court, he moved for a new trial. In responding to that motion, the prosecutor produced test results underlying previously produced Missouri State Highway Patrol Crime Laboratory reports. Based on these test results, Villasana hired an expert who performed additional DNA testing on the physical evidence in question. After the expert explained these test results at a hearing on the motion for new trial, the prosecutor urged the court to grant the motion and vacate Villasana's conviction, advising that the State would then dismiss the charges because it could no longer prove him guilty beyond a reasonable doubt. The court did so, and

Villasana was released that day. He then filed this § 1983 damage action against six Crime Laboratory officials, alleging that they violated his constitutional rights under Brady v. Maryland, 373 U.S. 83 (1963), by not disclosing documents underlying the lab reports prior to trial. The district court[1] granted summary judgment in favor of the defendants, concluding they are entitled to qualified immunity. Villasana appeals. We affirm.

After reporting the kidnaping and sexual abuse, the victim submitted to a rape kit examination, and a physician collected the victim's clothing and hospital bed sheet. This physical evidence was sent to the Crime Laboratory where serologist Joseph Roberts examined the sexual assault kit and the victim's clothing for the presence of semen. Roberts found none. It is Crime Laboratory policy to send official lab reports to the prosecuting attorney but to send additional information, such as underlying test results, only if requested to do so. Consistent with this policy, Roberts prepared and signed lab reports stating that "[s]emen was not detected" on this evidence. The Crime Laboratory sent those reports to the prosecutor.

Two months later, Villasana's trial counsel served a discovery request that included a demand for "results of any type of physical, mental or scientific testing conducted regarding this case . . . and all underlying notes of such experts." In response, the prosecutor produced the Crime Laboratory reports as part of her open file policy. She did not contact the Crime Laboratory to request its underlying test data, and defense counsel did not follow up with a request for any notes underlying the lab reports, even after Roberts referred to his notes in a pretrial deposition. Both the prosecutor and defense counsel were unfamiliar with the Crime Laboratory's policies and procedures.

---

[1]The HONORABLE SCOTT O. WRIGHT, United States District Judge for the Western District of Missouri.

The underlying documents produced after trial included Roberts's handwritten notes regarding the tests he had performed. The documents revealed (1) that vaginal swabs from the victim sexual assault kit tested positive for acid phosphatase, an enzyme found in seminal and other bodily fluids, but semen was not detected using the more precise "P30" test; and (2) that stains on the victim's sweatpants and hospital bed sheet had fluoresced, indicating the presence of biological material, but further testing did not detect the presence of semen. Based on these clues, Villasana's post-trial expert conducted DNA testing of a vaginal swab and stains on the victim's sweatpants and the hospital bed sheet. She was able to develop DNA profiles of an unknown male that were consistent with each other but inconsistent with the victim's husband and Villasana. After consulting with Roberts, the prosecutor advised the court that the State could not refute this evidence and that Villasana should be released.

Villasana then commenced this damage action. The second amended complaint alleged that Roberts and five Crime Laboratory supervisors violated Villasana's due process rights under Brady by failing to disclose or cause to be disclosed the underlying test documents and by failing to adopt policies and to train Roberts and other personnel to ensure "production of exculpatory or potentially exculpatory evidence." After substantial discovery, the district court granted defendants' motion for summary judgment, concluding they are entitled to qualified immunity from these claims. The court reasoned that no case has extended liability under Brady to crime laboratory technicians and therefore Villasana failed to show "that defendants had a clearly established obligation under Brady to disclose exculpatory or potentially exculpatory evidence to the prosecution or to the plaintiff." Reviewing de novo the question whether the asserted federal right was clearly established, we agree. See Elder v. Holloway, 510 U.S. 510, 516 (1994) (standard of review); Saucier v. Katz, 533 U.S. 194, 201 (2001) (whether a right is clearly established "must be undertaken in light of the specific context of the case"); Mowbray v. Cameron County, 274 F.3d 269, 278 (5th Cir. 2001) (no case has extended Brady liability to laboratory

technicians), cert. denied, 535 U.S. 1055 (2002). We further conclude that Villasana's damage claims are fatally flawed for the following additional reasons.

**1. No Brady Violation Occurred.** In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Materially favorable evidence includes both exculpatory and impeachment evidence. See United States v. Bagley, 473 U.S. 667, 676 (1985). To comply with Brady, a prosecutor must "learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995).

In this case, the prosecutor did not violate Brady prior to Villasana's conviction for two reasons. First, when serologist Roberts referred repeatedly to his lab notes in his pretrial deposition, the existence of the allegedly suppressed evidence became known to the defense. Brady requires no more. See Odem v. Hopkins, 192 F.3d 772, 777 (8th Cir. 1999); Nassar v. Sissel, 792 F.2d 119, 121-22 (8th Cir. 1986). Roberts's disclosure made the situation unlike that in Strickler v. Greene, 527 U.S. 263, 285 (1999), where the Court found cause excusing a state habeas petitioner's procedural default of a Brady claim because it was "especially unlikely that counsel would have suspected that additional impeaching evidence was being withheld."

Second, although the duty imposed by Brady extends to evidence in the State's possession not known to the prosecutor, it applies only to "favorable evidence rising to a material level of importance." Kyles, 514 U.S. at 438; see United States v. Agurs, 427 U.S. 97, 108-10 (1976). Therefore, the prosecutor's absolute duty to disclose under Brady is limited to evidence a reasonable prosecutor would perceive at the time as being material and favorable to the defense. Here, the Crime Laboratory tested the physical evidence, did not detect the presence of semen, and

reported that non-exculpatory fact to the prosecutor, who produced the lab reports for the defense. Underlying test documents consistent with the non-exculpatory reports were retained but not produced. These documents contained clues that led Villasana's post-conviction expert to conduct DNA testing the State elected not to perform. On their face, however, the documents had neither exculpatory nor impeachment value, and "the police do not have a constitutional duty to perform any particular tests." Arizona v. Youngblood, 488 U.S. 51, 59 (1988). Thus, the documents fell outside the scope of Brady's absolute duty to disclose. "To hold otherwise would impose an insuperable burden on the Government to determine what facially non-exculpatory evidence might possibly be favorable to the accused by inferential reasoning." United States v. Comosona, 848 F.2d 1110, 1115 (10th Cir. 1988); accord United States v. Poindexter, 727 F. Supp. 1470, 1485 (D.D.C. 1989).

**2. Brady's Absolute Duty Is Limited to the Prosecutor.** The Brady doctrine imposes an absolute duty on the prosecutor to produce all materially favorable evidence in the State's possession. This procedural due process doctrine reflects "the special role played by the American prosecutor in the search for truth in criminal trials." Strickler, 527 U.S. at 281. The Supreme Court has never imposed this absolute duty on law enforcement officials other than the prosecutor.

It is logical to impose Brady's absolute duty on the government official who will present the State's case at trial, who can be expected to gather material evidence from law enforcement agencies, and who is in the best position to evaluate whether evidence must be disclosed because it is materially favorable to the defense. When acting in those capacities, the prosecutor has absolute immunity from Brady damage claims under § 1983. Imbler v. Pachtman, 424 U.S. 409, 431 n.34 (1976); see Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) (immunity includes the prosecutor's "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial"); Jean v. Collins, 221 F.3d 656, 661 (4th Cir. 2000) (en banc) (Wilkinson, C.J., concurring), cert. denied, 531 U.S.

1076 (2001); <u>Moore v. Valder</u>, 65 F.3d 189, 194 (D.C. Cir. 1995), <u>cert. denied</u>, 519 U.S. 820 (1996).

Villasana would extend <u>Brady</u>'s absolute liability to any law enforcement officer who was part of the prosecutor's "team," including in this case scientists employed by the Highway Patrol Crime Laboratory. This extension is not needed to secure post-conviction relief for one whose conviction was tainted by a <u>Brady</u> violation, because the prosecutor's duty is absolute. The extension is simply a device to avoid the impact of the prosecutor's absolute immunity from § 1983 damage liability. We conclude the extension is unsound. In <u>Imbler</u>, the Court explained that one reason for applying the prosecutor's absolute common law immunity to § 1983 damage actions is that the focus of post-conviction procedures -- whether the accused received a fair trial -- "should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment." 424 U.S. at 427. That reasoning applies equally to post-conviction <u>Brady</u> inquiries into whether evidence unknown to the prosecutor should have been disclosed by another government official.

Under <u>Brady</u>, the prosecutor is responsible for failing to produce materially favorable evidence regardless of fault, that is, intentional suppression or bad faith. The Supreme Court has also considered whether other law enforcement officers, including laboratory technicians, should be liable for destroying evidence that *might* have produced test results favorable to the defense. The Court concluded that "failure to preserve potentially useful evidence does not constitute a denial of due process" in the absence of bad faith. <u>Youngblood</u>, 488 U.S. at 58; <u>see</u> <u>California v. Trombetta</u>, 467 U.S. 479, 488 (1984). We conclude this bad faith standard should likewise apply to due process claims that law enforcement officers preserved evidence favorable to the defense but failed to disclose it. In other words, <u>Brady</u> ensures that the defendant will obtain relief from a conviction tainted by the State's nondisclosure of materially

favorable evidence, regardless of fault, but the recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial. We note that the few decisions in other circuits purporting to extend "Brady liability" to police officers have involved claims of intentional or bad faith failure to disclose Brady material to the prosecutor or to the defense. See Newsome v. McCabe, 256 F.3d 747, 752 (7th Cir. 2001); McMillian v. Johnson, 88 F.3d 1554, 1569 (11th Cir. 1996), cert. denied, 521 U.S. 1121 (1997).

In this case, although Villasana argues that Roberts's pretrial deposition testimony misled defense counsel into not looking behind the non-exculpatory lab reports, there is no evidence the defendants acted in bad faith, that is, engaged in "a conscious effort to suppress exculpatory evidence." Trombetta, 467 U.S. at 488. The underlying test documents contained notes by serologist Roberts that were consistent with the disclosed lab reports. Roberts referred to his notes repeatedly during his pretrial deposition. Sending only the lab reports to the prosecutor was consistent with Crime Laboratory policy. Acting in accordance with agency policy tends to show good faith rather than bad, whether or not the policy is sound. See United States v. Gray, 126 F.3d 1109, 1110 (8th Cir. 1997). In these circumstances, even if the undisclosed documents were materially favorable to the defense under Brady, Villasana failed to establish the bad faith required under Youngblood to recover § 1983 damages from the Crime Laboratory officials.

The judgment of the district court is affirmed.

_____