# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3495

_____

Deborah L. Masten

*Petitioner - Appellant*

v.

United States of America

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 14, 2014
Filed: May 28, 2014

_____

Before LOKEN, MURPHY, and SMITH, Circuit Judges.

_____

LOKEN, Circuit Judge.

A jury convicted Deborah L. Masten of starting a fire that heavily damaged her failing tavern, Too Talls Two Eatery and Spirits ("Too Talls"), in violation of 18 U.S.C. § 844(i). We affirmed the conviction, rejecting Masten's claim of insufficient evidence. "While the evidence showed that Masten left the bar shortly after the last two employees," we explained, "the Government presented evidence . . . that Masten could have set the fire in that short period of time." United States v. Masten, 281 F.

App'x 640, 642 (8th Cir. 2008). Masten then filed a motion for new trial followed by a motion to vacate the conviction, see 28 U.S.C. § 2255, arguing that newly discovered evidence discredited critical testimony by government witnesses regarding the timing of events on the night in question; that the government suppressed this evidence in violation of Brady v. Maryland, 373 U.S. 83, 86-88 (1963); and that trial counsel provided ineffective assistance in failing to discover it. After an evidentiary hearing, the district court[1] denied a new trial and § 2255 relief. Masten appeals, arguing that the district court erred in denying relief under Brady. We granted a certificate of appealability on that issue and now affirm.

## I.

The fire started shortly after employees and then Masten left Too Talls after the bar closed on New Year's Eve, January 1, 2005. The government presented extensive evidence that the fire was intentionally started using an accelerant and that Too Talls was then in dire financial straits, sufficient for the jury to infer that Masten, the bar's owner, had motive and opportunity to commit the crime. These were the principal issues on direct appeal. See Masten, 281 F. App'x at 642.

Regarding the timing of events, a Too Talls bartender testified that, when he left after the bar closed, the building was intact and only Masten remained inside. Two employees of the Adair County detention center, located in the same block as Too Talls, testified that while taking a break just after 2:00 a.m., they saw Too Talls employees leaving from a parking lot across from the center and that Masten's red BMW was the last to depart. Highway patrolman Nicholas Berry testified that, at approximately 2:20 a.m., after leaving a DUI suspect at the detention center, he parked his patrol car in the parking lot to complete an Incarceration Report. Berry

---

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

saw two other vehicles leave the parking lot and then saw Masten at the corner walking toward a red car. She waved to Berry; he waved back and soon drove away. Masten later testified that the other employees left Too Talls and drove away before she did, and that she waved at a highway patrolman before getting into her vehicle and driving home. A 911 operator logged a call reporting the Too Talls fire at 2:23 a.m.; emergency personnel were dispatched one minute later.

The government introduced portions of the detention center's surveillance videos to corroborate this testimony. The trial exhibit was a DVD copy of relevant footage from two of the surveillance cameras. The government provided Masten with a copy of the DVD disc seven to ten days before trial, describing it as an accurate but poor quality copy. At trial, the government introduced the disc during the direct examination of Police Officer Douglas Fleshman. After Fleshman testified that he viewed the original video from the detention center's multi-camera surveillance system at the detention center the day after the fire, he was handed Exhibit 118, the DVD copy, and asked:

> Q  All right. And while viewing that video, what if anything did you observe from the video?
>
> [Defense counsel]: I'll object. The best evidence is the video, Judge.
>
> [The prosecutor]: I'll play the video.
>
> [Defense counsel]: He [Fleshman] isn't qualified.

Fleshman testified he had not viewed the DVD copy. Government counsel offered to provide testimony by the ATF agent and the technician responsible for transferring the detention center video "into a DVD form so we could play it for the Court." Defense counsel replied, "I don't want Tiebout [the technician]. What I am saying

is if [Fleshman] can say that this is in fact . . . what he viewed, that's fine." After a recess during which Fleshman viewed the DVD copy, he was asked:

> Q  Did it fairly and accurately depict . . . the video that you viewed on the 1st of January, 2005?
>
> A  Yes.

The court then admitted Exhibit 118, the DVD copy, and Exhibit 23, described as "the videotape that was recovered from the . . . Adair Country Sheriff," without objection. Exhibit 23 was not played for the jury.

Exhibit 118 showed several cars departing the parking lot near Too Talls and the detention center at the time in question. Masten's red sports car was last, leaving the parking lot a few seconds after Trooper Berry's patrol car. Approximately seven minutes after Masten drove away, the angle of one camera swung around to focus directly at Too Talls. A detention center employee testified that he made that camera adjustment when he heard the alert on the fire-police-ambulance radio frequency, tending to confirm other evidence of when the fast-developing fire was detected.

Masten's post-conviction motions were based upon a study of the surveillance images by Dr. Thomas Edwards, her retained expert. Edwards obtained and enhanced ("resolution adjusted") the original detention center video, which the government had retained in the ATF evidence file. In a pre-hearing affidavit, Dr. Edwards opined that the enhanced original video showed (i) Masten crossing the street to the parking lot from an alley near the back door of Too Talls, consistent with her trial testimony and contrary to Trooper Berry's testimony that he saw Masten at the street corner near the front entrance, closer to where the fire started; and (ii) Trooper Berry's patrol car driving south past the front entrance of Too Talls after leaving the parking lot, contrary to his testimony that he immediately turned right and headed west.

In his pre-hearing affidavit, Dr. Edwards explained that Exhibit 118, the DVD copy, was "doubly degraded" because it had been "created by the transfer of the original multichannel (multicamera) video data from the Adair County Jail's reel-to-reel 1/2" VHS recorder to a single channel . . . VHS tape from which the DVD copy video was made." During Dr. Edwards's testimony at the evidentiary hearing, when government counsel noted that the additional disclosures noted by Dr. Edwards were based on his enhancement, not the original VHS tape, the court observed, "You say the original VHS should have been produced, so let's look at that and let me compare that to the DVD that was actually used." Counsel for Masten could not because Dr. Edwards had not brought the equipment he used to produce the enhancement. ATF Agent Ryan Zornes advised the court that the Adair County Sheriff's Department "have switched from a VHS-type system to a digital system." The court then stated:

> Now as far as the Brady violation is concerned, [Masten has] to prove that exculpatory evidence was withheld from her by the government and . . . I can't decide whether the evidence is exculpatory because I can't see it but . . . I'm going to assume that this VHS shows what Doctor Edwards says it shows. . . . [S]o assuming that this was exculpatory, the question is whether it was withheld by the government. . . .

> Again, I get back to the fact that everyone knew this original was there and didn't look at it. . . . So this wasn't buried evidence, it was out there, nobody looked at it so . . . I'd be interested in knowing what [Masten's] evidence would be on this issue of the suppression of the evidence . . . .

Masten then called Agent Zornes. He testified that, after investigators watched the original multi-camera video on the Adair County Sheriff's "multiplex system," ATF seized the original video as evidence for trial. Zornes "was asked to try to get this VHS tape in a format that would be playable in court" without having to bring

in the Adair County equipment. The objective, Zornes testified, "was to make the evidence easy to play at trial."

Zornes testified that he took the original tape back to Adair County and, using their system, "selected the camera angles that were important for the investigation and then recorded those from the original multiplex, multi channel tape to the secondary VCR tape so that we had an individual tape with the specific camera angle that was needed for the case." Zornes then took "those tapes that had the specific camera angles broken down" to a technician at the St. Charles County Sheriff's Department, who "uploaded them into this Avid [video] system and then he created digital DVD for me that contained each specific camera angle that was consistent with what I had given him on the VHS tapes." Zornes watched the DVD copy after it was created. "I never saw anything different in my opinion from when I watched the VHS tape and then we watched the DVD. . . . [T]he thought never crossed my mind that [the] DVD was not an accurate representation of what the VHS tape depicted." On cross examination, government counsel showed Zornes trial Exhibit 23:

Q   This is the original VHS?

A   Yes, it is.

Q   And it was marked and -- into evidence. Do you recall?

A   It was presented in trial as an exhibit.

Q   Not shown, but . . . as an exhibit?

A   -- exhibit. Correct.

The district court then heard brief testimony by Masten's trial counsel. He admitted that he and Masten went over the DVD copy repeatedly before trial "and couldn't make much out of it," and that the original VHS copy as well as the DVD

copy were admitted into evidence at trial. The court then denied <u>Brady</u> relief, concluding that in the absence of evidence the government intended to mislead, "it was sufficient for purposes of Brady for [the prosecutor] to disclose to the defense that there was an original out there and having done that, arrangements could have been made for the original to be viewed by [defense counsel] and Miss Masten."

## II.

The conviction of a person in custody[2] will be vacated if it "was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). Masten argues on appeal that the government violated its due process obligation under <u>Brady</u>. To establish a <u>Brady</u> violation, Masten bears the burden of showing that the government suppressed evidence, either willfully or inadvertently; that the evidence was favorable to her, either because it was exculpatory or impeaching; and that it was material to the outcome at trial. <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999); <u>United States v. Walrath</u>, 324 F.3d 966, 969 (8th Cir. 2003). Masten argues the government suppressed exculpatory evidence shown on the original videotape (as enhanced by Dr. Edwards) by representing that the DVD copy was a fair and accurate copy of the original, and that the suppressed exculpatory evidence was material because it would have discredited testimony by Trooper Berry that was critical to the government's proof that Masten "was the last one at Too Talls before the fire."

We agree with the district court's resolution of this issue. First, as the court carefully explained, the record is clear that the government produced trial Exhibit 118, the DVD copy, a week before trial. "A [§ 2255 petitioner] fails to show the

[2]Although Masten's criminal case was later terminated, she was on supervised release when the § 2255 motion was filed, satisfying the statute's "custody" requirement. <u>See</u> <u>Nguyen v. United States</u>, 114 F.3d 699, 703 (8th Cir. 1997).

prosecution suppressed evidence when the defendant was aware of and had access to the evidence." Walrath, 324 F.3d at 969. Masten's trial attorney testified that he and Masten viewed the DVD's poor quality images before trial, were aware the DVD disc was copied from the original surveillance video, and made no attempt to view the original. As in Walrath, "The [original] videotape was not suppressed. Before trial [it] was acknowledged and made available . . . . [Masten] chose not to view it." Id.; see United States v. Femia, 9 F.3d 990, 995 (1st Cir. 1993).

Second, ATF Agent Zornes had the DVD copy created for a legitimate purpose, viewed the copy after it was created, and concluded that it accurately represented what the original VHS tape depicted. "[T]he prosecutor's absolute duty to disclose under *Brady* is limited to evidence a reasonable prosecutor would perceive at the time as being material and favorable to the defense." Villasana v. Wilhoit, 368 F.3d 976, 979 (8th Cir. 2004), cert. denied, 543 U.S. 1153 (2005). In that case, test documents underlying non-exculpatory [lab] reports "contained clues that led [defendant's] expert to conduct DNA testing the State elected not to perform. On their face, however, the documents had neither exculpatory nor impeachment value, and 'the police do not have a constitutional duty to perform any particular tests.'" Id., quoting Arizona v. Youngblood, 488 U.S. 51, 59 (1988). Similarly here, the government had no constitutional duty to perform the enhancement later performed by Dr. Edwards searching for "clues" the DVD copy failed to disclose. "'To hold otherwise would impose an insuperable burden on the Government to determine what facially non-exculpatory evidence might possibly be favorable to the accused by inferential reasoning.'" Villasana, 368 F.3d at 979; see Youngblood, 488 U.S. at 55; United States v. Agurs, 427 U.S. 97, 109-10 (1976).

Finally, we note that the VHS video *was admitted at trial as Exhibit 23*. Agent Zornes was available at trial to explain, as he did at the post-conviction hearing, that the original video was copied to make the surveillance evidence easy to present and more understandable at trial, and the process by which the DVD copy was produced.

-8-

It "never crossed my mind," Zornes testified, "that [the] DVD was not an accurate representation of what the VHS tape depicted." Likewise, Officer Fleshman, after viewing the DVD copy at trial, testified it was a "fair and accurate" copy of the original video he saw the day after the fire. We find it hard to imagine a clearer case of failure to prove that the government "suppressed" evidence in violation of Brady, regardless of how exculpatory or material evidence only disclosed by the original videotape might have been.

We further note that Dr. Edwards's opinion that the original tape contained favorable information not disclosed on the DVD copy was based on his *enhancement* of the VHS original. Masten totally failed to prove what additional information the jury would have gained by viewing the unenhanced VHS original at trial. This is fatal to a claim that "material" evidence was suppressed, which requires proof of "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Strickler, 527 U.S. at 280.

Beyond that, we find Masten's claim of materiality unpersuasive. According to Dr. Edwards, the original footage (as enhanced) casts doubt on Trooper Berry's testimony that he saw Masten at the corner, nearer the front door, rather than crossing in the middle of the street as she likely would after exiting the back door. But at trial, Masten confirmed Berry's testimony that she waved to him, and he waved back, as she walked to her car. Berry did not testify that he saw Masten come out of the front door, so the original video would establish, at most, a minor mistake in the recollection of a witness who was not central to the government's case. The other discrepancy allegedly established by Dr. Edwards's enhancement was that Trooper Berry drove past the front entrance of Too Talls after leaving the parking lot, instead of turning west as he testified. But it is undisputed that Berry drove away before anyone detected the fire, so impeaching him on this point seems hardly material to whether Masten, the last employee to leave Too Talls, had motive and opportunity to start the fire. Despite Masten's argument to the contrary, we are unable to see a

-9-

reasonable probability that this partial discrediting of Berry's testimony would have produced a different result.  See Strickler, 527 U.S. at 291.

The judgment of the district court is affirmed.  We grant Masten's motion to supplement the appendix on appeal.

_____