**19-2418-cv; 19-2443-cv**
*Horn; Jackson v. Stephenson*

In the

# United States Court of Appeals

### For the Second Circuit

_____

AUGUST TERM 2020

ARGUED: SEPTEMBER 3, 2020
DECIDED: AUGUST 26, 2021

_____

No. 19-2418-cv

VERNON HORN,
*Plaintiff-Appellee,*

*v.*

JAMES STEPHENSON,
*Defendant-Appellant,*

CITY OF NEW HAVEN, LEROY DEASE, PETISIA ADGER,
DARYLE BRELAND,
*Defendants.*

_____

No. 19-2443-cv

MARQUIS JACKSON,
*Plaintiff-Appellee,*

*v.*

JAMES STEPHENSON,
*Defendant-Appellant,*

CITY OF NEW HAVEN, LEROY DEASE, PETISIA ADGER,
DARYLE BRELAND,
*Defendants.*

————

On Appeal from the United States District Court for the
District of Connecticut.

————

Before: LIVINGSTON, *Chief Judge*, WALKER and JACOBS, *Circuit Judges.*

————

After each serving more than 17 years in prison for a robbery and murder they did not commit, plaintiffs Vernon Horn and Marquis Jackson brought civil rights actions against the City of New Haven and law enforcement officials under 42 U.S.C. § 1983.  As relevant here, plaintiffs alleged that police forensic examiner James Stephenson violated their due process rights under the Fourteenth Amendment by withholding exculpatory ballistics reports in contravention of *Brady v. Maryland*.  Stephenson moved to dismiss both actions, asserting a defense of qualified immunity and, in Horn's case, a defense of absolute immunity.  The district court (Jeffrey A. Meyer, *J.*) denied both motions.  On appeal, Stephenson argues (1) that it was not clearly established by 1999 that police firearms examiners have a duty of disclosure under *Brady*, and (2) that he generated one of the reports at the prosecutor's direction.  For the reasons that follow, we **AFFIRM** the rulings of the district court.

————

DOUGLAS E. LIEB (Ilann M. Maazel, *on the brief*), Emery Celli Brinckerhoff & Abady LLP, New York, NY, *for Plaintiff-Appellee Vernon Horn*.

KENNETH ROSENTHAL, Law Office of Kenneth Rosenthal, New Haven, CT, *for Plaintiff-Appellee Marquis Jackson*.

STEPHEN R. FINUCANE, Assistant Attorney General (Clare Kindall, Solicitor General, *on the brief*), *for* William Tong, Attorney General of the State of Connecticut; *for Defendant-Appellant*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

After each serving more than 17 years in prison for a robbery and murder they did not commit, plaintiffs Vernon Horn and Marquis Jackson brought civil rights actions against the City of New Haven and law enforcement officials under 42 U.S.C. § 1983. As relevant here, plaintiffs alleged that police forensic examiner James Stephenson violated their due process rights under the Fourteenth Amendment by withholding exculpatory ballistics reports in contravention of *Brady v. Maryland*. Stephenson moved to dismiss both actions, asserting a defense of qualified immunity and, in Horn's case, a defense of absolute immunity. The district court (Jeffrey A. Meyer, *J.*) denied both motions. On appeal, Stephenson argues (1) that it was not clearly established by 1999 that police firearms examiners have a duty of disclosure under *Brady*, and (2) that he

generated one of the reports at the prosecutor's direction. For the reasons that follow, we AFFIRM the rulings of the district court.

BACKGROUND

In reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), we draw our discussion of the facts from the complaint, which must be taken as true.[1]

On January 23, 1999, Vernon Horn and Marquis Jackson went out on a Saturday night in downtown New Haven. The two teenagers met up with friends at the Alley Cat nightclub and then stopped by Dixwell Deli (the Deli), a 24-hour convenience store, at around 2:45 a.m. After purchasing a few items, they drove back to Jackson's apartment several blocks away.

Around 3:30 a.m., three masked robbers burst into the Deli and opened fire. The shots hit an employee and a customer, Caprice Hardy, who died shortly thereafter. After stealing a cellphone from a store clerk and trying unsuccessfully to raid the cash register, the robbers fled the scene.

A few minutes after the robbery, Horn walked back to the Deli. This raised the suspicions of the lead detective on the investigation, who believed that perpetrators of homicides tended to return to crime scenes. After interviewing Horn at the Deli and learning that he had spent the night with Jackson, detectives in the New Haven Police Department (NHPD) began building a case against the two teenagers.

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Numerous pieces of evidence, however, suggested that a group of drug dealers in Bridgeport, Connecticut, not Horn or Jackson, was responsible for the murder-robbery. Call records for the stolen cellphone showed that four out of five calls made after the incident were to the Bridgeport drug dealers or their associates. Because the records did not support the case against Horn and Jackson, NHPD officers suppressed the records for nearly 20 years, hiding them in the basement of a detective's house.

After identifying the first of the five callers as Steve Brown, one of the Bridgeport drug dealers, NHPD detectives still continued to press the case against Horn and Jackson. The detectives even went so far as to coach Brown to provide a false statement implicating the two teenagers in the robbery. According to the fabricated story, on the night of the robbery, Horn and Jackson met Brown, all three of whom are African-American, for the first time at an all-white Polish social club, drove him to Dixwell Deli, and convinced him to participate in the robbery.

Most relevant to this appeal, Brown claimed that Horn shot Hardy, the Deli customer who died, using a Beretta handgun. Shortly after the robbery, NHPD sent shell casings and bullet fragments from the crime scene to the Connecticut State Police Forensic Science Laboratory (State Police Laboratory) for analysis. Connecticut law defines the State Police Laboratory's role as providing "technical assistance to law enforcement agencies in the various areas of scientific investigation."[2] On February 3, 1999, defendant James Stephenson, the assigned firearms examiner, generated a General Rifling Characteristics Report (the 1999 GRC Report) that listed all firearm models that potentially matched the ballistics evidence, using

_____

[2] Conn. Gen. Stat. § 29-7b (1999).

a margin of error of +/- 2 thousandths of an inch.  A Beretta handgun was not among the possible matches.

The next day, Stephenson prepared a memo to the NHPD based on the 1999 GRC Report.  The memo stated, "The bullets and bullet fragments are consistent with being 9mm caliber.  They may have been fired from but not limited to a self loading pistol manufactured by Calico, FEG, Browning, Heckler & Koch, Hungarian, Kassnar, Norinco, or Walther."[3]  This list matched the firearm models in the 1999 GRC Report and made no mention of a Beretta handgun.  The memo—but not the underlying 1999 GRC Report—was provided in a timely manner to the State's Attorney's Office and to counsel for both Horn and Jackson.

In early 2000, while preparing for trial, Assistant State's Attorney Gary Nicholson noticed the inconsistency in the evidence: Brown had identified the murder weapon as a Beretta handgun, but Stephenson's memo did not include a Beretta as a potential match to the ballistics evidence.  Nicholson called Stephenson and asked him whether the murder weapon could have been a Beretta.  On February 15, 2000, Stephenson generated a second GRC Report (the 2000 GRC Report).  This time, using a larger margin of error of +/- 4 thousandths of an inch, the report listed multiple Beretta models as potential matches.  At no time prior to or during trial did Stephenson disclose either the 1999 GRC Report or the 2000 GRC Report to the State's Attorney's Office or to counsel for Horn or Jackson.

Horn and Jackson were tried together in 2000. Stephenson testified at trial that the murder weapon could have been a Beretta, based on "new information" that he said was provided by Nicholson.

_____

[3] Horn Compl. ¶ 160; Jackson Compl. ¶ 130.

He denied having created any "reports when he had gotten the new information from the State's Attorney's Office."[4]  Horn was convicted on all ten counts and sentenced to 70 years in prison.  Jackson was convicted on eight of ten counts and sentenced to 45 years in prison.

In 2018, as part of a re-examination of the case by the Connecticut Federal Public Defender's Office, the NHPD produced the stolen cell phone's call records and both the 1999 GRC Report and the 2000 GRC Report.  After reviewing the belatedly disclosed evidence, the State's Attorney's Office successfully moved to vacate the judgments of conviction for both men.  In or around April 2018, after serving 17 and 19 years in prison,[5] respectively, Horn and Jackson were released.

Horn and Jackson then each brought a federal civil rights action separately under 42 U.S.C. § 1983 against the City of New Haven and certain law enforcement officials.  As regards Stephenson, plaintiffs alleged that he violated their constitutional right to due process under *Brady v. Maryland*[6] by withholding the 1999 and 2000 GRC Reports from the State's Attorney's Office.  Stephenson filed a motion to dismiss in each case, asserting in both cases that he was entitled to qualified immunity and, in Horn's case, that he was entitled to absolute immunity.  The district court denied both motions, and this appeal followed.

---

[4] Horn Compl. ¶ 173.

[5] Horn was briefly released for two years on a writ of habeas corpus, before the Connecticut Supreme Court reversed that decision and reinstated his convictions.

[6] 373 U.S. 83 (1963).

## DISCUSSION

On appeal, Stephenson argues that: (1) he is entitled to qualified immunity because it was not clearly established by 1999 that "firearms examiners" had an obligation under *Brady* to turn over exculpatory evidence to the prosecutor; and (2) he is entitled to absolute immunity with respect to the 2000 GRC Report because he prepared it at the prosecutor's direction. We disagree. For the reasons that follow, we conclude that, based on the facts alleged in plaintiffs' complaints, Stephenson cannot make out a defense of either qualified immunity or absolute immunity.

## I.  Stephenson Is Not Entitled to Qualified Immunity

A person may bring an action under 42 U.S.C. § 1983 to seek money damages from a government official who violates his or her constitutional rights. "[T]o ensure that fear of liability will not unduly inhibit officials in the discharge of their duties," however, "the officials may claim qualified immunity."[7] Qualified immunity shields the official from civil liability unless: "[1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct."[8] The doctrine aims to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[9]

A right is clearly established if, at the time of the challenged conduct, it was "sufficiently clear that every reasonable official would

---

[7] *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (internal quotation marks and citation omitted).

[8] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

[9] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[have understood] that what he is doing violates that right."[10] Because "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply" in a particular factual situation,[11] "clearly established law must be particularized to the facts of the case."[12] The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality."[13] This standard "ensure[s] that the official being sued had 'fair warning' that his or her actions were unlawful."[14] Still, the plaintiff need not show "a case directly on point," as long as "existing precedent . . . placed the statutory or constitutional question beyond debate."[15]

In determining the state of the law, we consider Supreme Court and Second Circuit precedent existing at the time of the alleged violation.[16] "Even in the absence of binding precedent, a right is clearly established if '[t]he contours of the right [are] sufficiently clear that . . . [t]he unlawfulness [is] apparent.'"[17] "[I]f decisions from this or other circuits clearly foreshadow a particular ruling on the issue," we may treat the law as clearly established.[18]

---

[10] *Reichle*, 566 U.S. at 664 (internal quotation marks omitted).

[11] *Sloley v. VanBramer*, 945 F.3d 30, 40 (2d Cir. 2019).

[12] *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted).

[13] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted) (collecting cases).

[14] *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

[15] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[16] *Terebesi*, 764 F.3d at 231.

[17] *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999) (first and second alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[18] *Terebesi*, 764 F.3d at 231 (internal quotation marks omitted).

We review *de novo* a district court's denial of a motion to dismiss based on qualified immunity.[19] We hear such denials on interlocutory appeal in light of the Supreme Court's repeated invocation of the "importance of resolving immunity questions at the earliest possible stage [of the] litigation."[20] While qualified immunity may be "successfully asserted" on a motion to dismiss the complaint,[21] the defense "faces a formidable hurdle" at the pleading stage.[22] We may review a denial of a motion to dismiss on the basis of immunity only to the extent that the denial turned on questions of law.[23] The defendant "must therefore show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."[24] Moreover, "the plaintiff is entitled to all reasonable inferences from the facts alleged," including "those that defeat the immunity defense."[25] If we cannot decide the availability of qualified immunity as a matter of law, we must dismiss the appeal.[26]

---

[19] *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001).

[20] *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (alteration in original) (quoting *Wood v. Moss*, 572 U.S. 744, 755 n.4 (2014)).

[21] *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004).

[22] *Id.* at 434.

[23] *Hill v. City of New York*, 45 F.3d 653, 659–60 (2d Cir. 1995).

[24] *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018) (per curiam) (internal quotation marks omitted).

[25] *McKenna*, 386 F.3d at 436.

[26] *Brown*, 885 F.3d at 117.

### A. It Was Clearly Established by 1999 That Police Forensic Examiners Must Disclose Exculpatory Information

In 1963, *Brady v. Maryland* established the affirmative duty of the prosecution to turn over exculpatory evidence to the defense. There, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[27] *Brady* specifically addressed the disclosure obligation of the prosecution. In concluding that such a duty exists, the Supreme Court relied on two prior cases that referenced a broad obligation on the part of the state not to obtain a defendant's conviction through deception. In *Mooney v. Holohan*, the Supreme Court stated that "a contrivance by a state to procure the conviction and imprisonment of a defendant is . . . inconsistent with the rudimentary demands of justice."[28] And in *Pyle v. State of Kansas*, the Court held that "the deliberate suppression by [state] authorities of evidence favorable to [the defendant]" violates due process.[29]

In 1995, the Supreme Court in *Kyles v. Whitley* confirmed that the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."[30] As in *Brady*, *Kyles* focused on the obligation of the prosecutor.[31] The *Kyles* Court also acknowledged, however, that the *Brady* obligation is not limited to material initially in the possession of

---

[27] *Brady*, 373 U.S. at 87.

[28] *Id.* at 86 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

[29] *Id.* (quoting *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)).

[30] *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

[31] *Id.*

the prosecution but also includes information in the hands of the police.[32]   Noting that "no one doubts that police investigators sometimes fail to inform a prosecutor of all they know," the Court observed that the state may need to establish "'procedures and regulations . . . to carry [the prosecutor's] burden and to [e]nsure communication of all relevant information on each case to every lawyer who deals with it.'"[33]

Applying the teachings of *Brady*, in 1992, we recognized in *Walker v. City of New York* that the government's disclosure obligation applied to the police when we held that "the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors."[34]  That rule makes good sense, we reasoned, because the police may lack "the requisite legal acumen" to determine whether materials constitute *Brady* evidence, and therefore they should not be charged with "mak[ing] separate, often difficult, and perhaps conflicting, disclosure decisions."[35]

Stephenson does not dispute that *Walker* clearly established the duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused.  Nor does he contest in this appeal that the GRC Reports were material and exculpatory.  He presses a qualified immunity defense on the sole basis that *Walker* does not apply to a firearms examiner employed by the State Police Laboratory.  We disagree and conclude that a police forensic examiner, whether an analyst or technician fulfilling any of the roles associated with forensic analysis, in 1999 reasonably would have understood that he

---

[32] *Id.* at 437–38.

[33] *Id.* at 438 (first alteration in original).

[34] 974 F.2d 293, 299 (2d Cir. 1992).

[35] *Id.*

or she was required to turn over exculpatory information to the prosecutor.

To begin, plaintiffs affirmatively pleaded that Stephenson was a member of the state police department who examined crime scene evidence on the NHPD's behalf. Specifically, the complaints alleged that Stephenson was employed as a forensic and firearms examiner in the Connecticut State Police Forensic Science Laboratory, which "served as the forensics arm of the NHPD."[36] The State Police Laboratory is statutorily charged with "provid[ing] technical assistance to law enforcement agencies,"[37] principally for the purposes of determining "(1) [t]hat a crime was committed [or] (2) [t]hat the crime is connected to the victim or perpetrator(s)."[38] In the criminal investigation against Horn and Jackson, Stephenson fulfilled precisely that role: plaintiffs alleged that the NHPD sent Stephenson shell casings and bullet fragments from the crime scene for testing, and that Stephenson analyzed this evidence in order to help identify the perpetrator. As an employee of a division of the Connecticut State Police whose principal function was to assist law enforcement in carrying out its investigative efforts, Stephenson reasonably would have understood himself to be a member of the police to whom *Brady* applies.

That Stephenson was a technical specialist, and not a sworn officer, does not place him beyond the scope of *Walker*. It is well settled that the absence of precedent involving "fundamentally similar" facts is not fatal to a finding that the law is clearly

---

[36] Jackson Compl. ¶ 128; *see also* Horn Compl. ¶¶ 157, 276.

[37] Conn. Gen. Stat. § 29-7b (1999).

[38] Jackson Compl. ¶ 127.

established.[39]  "[T]he salient question . . . is whether the state of the law . . . gave [the defendant] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional."[40]  Here, no reasonable police forensic examiner would have understood *Walker* to turn on the distinction between sworn and unsworn police officers advanced by Stephenson.  While that case involved alleged misconduct by a sworn police detective,[41] it did not distinguish between sworn and unsworn police officers, and Stephenson puts forward no compelling explanation for why the sworn / unsworn distinction would be at all relevant to the decision's constitutional holding.  Regardless of whether the police official concealed material that he collected as a sworn officer or material that he analyzed as an unsworn forensic examiner, "a contrivance by a state to procure the conviction and imprisonment of a defendant"[42] violates due process all the same.  That the police official in *Walker* was a sworn officer is as irrelevant to the *Brady* analysis as the fact that he happened to be a police detective, as opposed to a patrol officer.

If anything, it is Stephenson's interpretation, if accepted, that would require officials to parse the factual nuances of *Brady* and its progeny.  Jackson alleged that the State Police Laboratory staffs its forensic examiners with former, sworn detectives from the NHPD, and that Stephenson himself was an NHPD detective immediately prior to joining the State Police Laboratory.  There is no suggestion in the relevant case law that these forensic examiners would have somehow relinquished their *Brady* obligations upon transferring from the NHPD to the State Police Laboratory.  To the contrary, these

---

[39] *Hope*, 536 U.S. at 741.

[40] *Id.*

[41] *Walker*, 974 F.2d at 295.

[42] *Brady*, 373 U.S. at 86 (quoting *Mooney*, 294 U.S. at 112).

allegations further support the conclusion that no reasonable forensic examiner in Stephenson's position would have drawn a distinction between sworn and unsworn officers in understanding the duty of disclosure established in *Walker*.

Our conclusion, based on *Walker*, that *Brady* applies to forensic examiners in state crime laboratories is reinforced by decisions of our sister circuits that by 1999 had reached the same conclusion.  The Fifth Circuit found that "the law was sufficiently clear in 1984 that a state crime lab technician would have known that suppression of exculpatory . . . test results would violate a defendant's rights."[43]  The Sixth Circuit observed that, "at least as early as April or May of 1990," the legal norm that "a forensic expert may be subject to suit under § 1983 for deliberately withholding the existence of exculpatory forensic evidence" was clearly established.[44]  The Tenth Circuit stated that it had "no doubt that . . . an official in [a state crime lab chemist's] position in 1986 had 'fair warning' that the deliberate or reckless falsification or omission of evidence was a constitutional violation."[45]

This pattern of decisions is not undermined by the single, Eighth Circuit case cited by Stephenson for support.[46]  In *Villasana v. Wilhoit*, the crime laboratory technician concealed reports from the prosecutor in accordance with agency policy.[47]  Focusing on the issue of fault, the court concluded that the technician was entitled to

---

[43] *Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008).

[44] *Moldowan v. City of Warren*, 578 F.3d 351, 397 (6th Cir. 2009).

[45] *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004); *see also Jones v. City of Chicago*, 856 F.2d 985, 993, 995 (7th Cir. 1988) (Posner, J.) (affirming jury's verdict that a police laboratory technician was liable under 42 U.S.C. § 1983 for omitting exculpatory information from a lab report).

[46] *See Villasana v. Wilhoit*, 368 F.3d 976 (8th Cir. 2004).

[47] *Id.* at 980.

qualified immunity because "there [wa]s no evidence the defendants acted in bad faith, that is, engaged in 'a conscious effort to suppress exculpatory evidence.'"[48]  Nowhere in *Villasana* did the court hold or suggest that *Brady* is limited to certain subgroups of police officers. To the contrary, it assumed that state crime laboratory technicians have a constitutional duty not to withhold exculpatory information intentionally.[49]

Finally, we easily reject Stephenson's argument that he was simply a "forensic witness[]" or "lay expert."[50]  Plaintiffs alleged that he was employed by the State Police Laboratory and was responsible for analyzing physical evidence exclusively on behalf of the police.  In the criminal cases against plaintiffs, he is alleged to have worked closely with the police and the prosecutor, including by testing ballistics evidence, authoring multiple reports, and assisting the lead prosecutor in preparing for trial.  His role went beyond that of a third-party expert witness retained to "help the trier of fact . . . understand the evidence or to determine a fact in issue."[51]  For the reasons set forth above, we conclude that Stephenson is not entitled to qualified immunity based on the facts appearing on the face of the complaints.

---

[48] *Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)).

[49] *Id.* at 980–81 (affirming the grant of qualified immunity on the basis that "Villasana failed to establish the bad faith required . . . to recover § 1983 damages from the Crime Laboratory officials").

[50] Appellant's Br. 19, 28.

[51] Fed. R. Evid. 702(a).

## II.     Stephenson Is Not Entitled to Absolute Immunity

Stephenson asserts in the action brought by Horn that he has absolute immunity for his role in creating the 2000 GRC Report.[52] Absolute immunity protects "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State."[53] The prosecutor is not immune for acts performed in an administrative or investigative capacity.[54]   As relevant here, absolute immunity extends "also [to] individual employees who assist . . . an official [shielded by absolute immunity] and who act under that official's direction in performing functions closely tied to the judicial process."[55]

We need not reach the question of whether Stephenson generated the 2000 GRC Report in furtherance of the prosecutor's advocacy function because there is no allegation that Nicholson requested a new report.   Horn pleaded simply that the "Assistant State's Attorney Nicholson . . . called . . . [and] asked Stephenson whether it was possible the murder weapon could have been a Beretta."[56]   Then, "[o]n February 15, 2000, Stephenson generated a new General Rifling Characteristics Report, this time manipulating the report to increase the margin of error to +/- 4."[57]   Even if we concluded that adjusting the margin of error constituted prosecutorial

---

[52] Stephenson did not assert an absolute immunity defense in Jackson's case because Jackson's complaint did not reference any communication between Stephenson and the prosecutor.

[53] *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997).

[54] *Hill*, 45 F.3d at 661.

[55] *Id.* at 660.

[56] Horn Compl. ¶ 166.

[57] *Id.* ¶ 167.

advocacy, the complaint nowhere alleges that Nicholson asked, much less instructed, Stephenson to create a new GRC Report using a larger margin of error. Moreover, Horn affirmatively alleged that Nicholson never saw the 2000 GRC Report prior to trial, which further suggests it was not created at his request.

Undeterred, Stephenson asks us to make that inference based on the timing and context of Nicholson's phone call. This we cannot do. In reviewing a motion to dismiss, we draw all reasonable inferences in the plaintiff's favor, including those that defeat an immunity defense.[58] The allegations here are consistent with Horn and Jackson's theory that Stephenson independently decided to manipulate the margin of error upon learning that the memo based on the 1999 GRC Report would weaken the state's case against Horn and Jackson. For these reasons, we conclude that Stephenson is not entitled to an absolute immunity defense based on Horn's pleadings.

## CONCLUSION

For the foregoing reasons, we AFFIRM the rulings of the district court.

---

[58] *McKenna*, 386 F.3d at 436.